**SPRINT SPECTRUM, L.P., d/b/a Sprint PCS, Plaintiff–Appellant,**

v.

**Craig WILLOTH, Chairman, Thomas McCune, Craig Litt, William Quinn, and Edward Kerkhoven, Members, Constituting the Town of Ontario Planning Board, and Edward Collins, Code Enforcement Officer for the Town of Ontario, Defendants–Appellees.**

**Docket No. 98–7442.**

United States Court of Appeals, Second Circuit.

Argued Nov. 23, 1998.

Decided May 24, 1999.

**634**

Paul J. Yesawich, III, Harris Beach & Wilcox, LLP., Rochester, NY, (Jonathan Johnsen, Harris Beach & Wilcox, LLP., Rochester, N.Y. and Robert Hornik, Jr., Syracuse, NY, on the brief), for Plaintiff–Appellant.

John M. Wilson, II, Boylan, Brown, Code, Fowler, Vigdor & Wilson, LLP, Rochester, NY, (Richard A. Palumbo, Boylan, Brown, Code, Fowler, Vigdor & Wilson, LLP, Rochester, NY, on the brief), for Defendants–Appellees.

The Association of Towns of the State of New York and the National Association of Towns and Townships (Lori A. Mithen, for the Association of Towns in the State of New York, Albany, New York, Tom Halicki, Executive Director for the National Association of Towns and Townships, Washington, D.C.), filed a brief as Amici Curiae in support of defendants-appellees.

The Personal Communications Industry Association (John L. Bartlett, Eric W. DeSilva, Stephen J. Rosen, Wiley, Rein & Fielding, Washington, D.C.), filed a brief as Amicus Curiae in support of plaintiff-appellant.

Before: OAKES, WALKER, and McLAUGHLIN, Circuit Judges.

JOHN M. WALKER, Jr., Circuit Judge:

Sprint Spectrum, L.P., d/b/a/ Sprint PCS, appeals from the grant of summary judgment of the United States District Court for the Western District of New York (Michael A. Telesca, *Judge*) upholding the decision of the Planning Board for the Town of Ontario, New York, to reject Sprint PCS's application to build three communications towers. *See Sprint Spectrum, L.P. v. Willoth,* 996 F.Supp. 253 (W.D.N.Y.1998). Affirmed.

## BACKGROUND

Sprint PCS ("Sprint") is licensed by the Federal Communications Commission ("FCC") to provide broadband personal communications services ("PCS"), a form of wireless telecommunications, to the Buffalo Major Trading Area ("Buffalo MTA"). The Buffalo MTA includes portions of northern Pennsylvania and most of the counties in Western and Central New York, including the Town of Ontario.

PCS services uses digital technology as opposed to the analog technology used in cellular telephones. Both PCS and cellular services require the user to be within range of a wireless telecommunications facility called a cell site. The geographic area covered by a particular cell site is called a cell, and a provider achieves seamless coverage throughout a greater area by constructing a grid-pattern of adjacent honey-comb shaped cells. Each cell site requires antennae and equipment to provide reliable coverage throughout the cell and to switch the signal from one cell to the next as a PCS user moves through an area. The antennae need not be placed

exactly in the center of each cell, but can be placed anywhere within 25% of the radius of the hexagon to be covered. The antennae may be placed on preexisting structures such as a building or a billboard. But absent suitable preexisting structures within 25% of the cell radius, it is necessary to erect a tower for the antennae.

Numerous factors affect the size of a cell. The higher frequency and lower power of the digital signals means that the maximum effective distance between a cell site and a PCS wireless phone is shorter than for analog service, and the size of the cells correspondingly smaller. A PCS network within a given area therefore requires more cell sites and towers than an analog cellular system. Additional factors that affect the cell size are topography, building density and population density. Population density tends to factor into the cell size in two ways: (1) it is a rough measure of building density and type, and (2) it is also an indicator of how many telephone users will be located within a cell. As the distance and number of obstructions between a cell site and a PCS telephone increases, the signal becomes more attenuated. If it dips below a certain threshold, communication will be interrupted by static, become unreliable, and eventually disappear. In addition to signal strength, the limited bandwidth available to PCS providers can accommodate only a certain number of wireless phone calls within a particular cell at any one time. Therefore, as phone use within an area increases, it may become necessary to shrink the cell to ensure that the system has sufficient capacity to provide reliable service.

Lucent Technologies, the designer of Sprint's PCS system in the Buffalo MTA, has developed guidelines to determine the appropriate cell radius based on the population density of a particular area. Lucent defines a rural morphology as an area in which the population density is less than 250 people per square mile, and the recommended cell radius is set at 4 miles. A suburban morphology corresponds to a population density between 250 and 1778 people per square mile, and a cell radius of 1.5 miles. Where the number of people per square mile is over 1778 but less than 7111, the morphology is urban and the cell radius is set at 0.75 miles. Since Ontario has a population density of approximately 261 per square mile, it is just within the numerical limits for a suburban morphology according to Lucent's criteria. The Lucent Technology criteria are only estimates of use and building size and type, and where the population density is near the line between two morphologies, the smaller cell and larger number of cells may constitute a substantial overbuild.

On or about May 5, 1996, Sprint presented its proposal to build three cell sites to representatives from Ontario as part of its plan to provide PCS services to the town. It was agreed at that meeting that, to proceed with the construction, Sprint needed a site plan approval from the Town of Ontario Planning Board ("Planning Board" or "Board"). Subsequently, Sprint filed three applications for site plan approval, proposing to construct a 150 foot tall antennae tower at three separate locations: 426 Ridge Road, 6954 Slocum Road, and 193 County Line Road.

The Planning Board first considered Sprint's three applications at its public meeting on June 11, 1996. At the meeting, Sprint generally described the PCS technology and reviewed its plans. The Board decided to hold a public hearing on Sprint's application on July 9, 1996, and asked Sprint to submit a Full Environmental Assessment Form ("FEAF") and visual addendum for each application so that the Planning Board could determine whether Sprint was required to file an environmental impact statement ("EIS") pursuant to New York's State Environmental Quality Review Act ("SEQRA"). *See* N.Y. Envtl. Conserv. L. § 8–0101 *et seq.* (McKinney 1997).

SEQRA requires agencies to evaluate whether pending actions have significant environmental consequences, *see Village of Westbury v. Department of Transp.*, 75 N.Y.2d 62, 68, 550 N.Y.S.2d 604, 549 N.E.2d 1175 (1989), and, if so, requires the agency to go through an EIS procedure beginning with a draft EIS ("DEIS") and continuing through a final EIS ("FEIS") aimed at ferreting out the environmental consequences of approving a project as well as practicable mitigating measures, *see Society of the Plastics Indus., Inc. v. County of Suffolk*, 77 N.Y.2d 761, 769–70, 570 N.Y.S.2d 778, 573 N.E.2d 1034 (1991). *See also* N.Y. Envtl. Conserv. L. § 8–0109; *id.* § 8–0109 note (McKinney 1997) (Background, Purpose and Construction).

Following the public hearing, the Board met to review Sprint's applications on August 13, 1996 in accordance with SEQRA's requirements. That meeting primarily revolved around alternative sites and network designs for the Town of Ontario which the Board had asked Sprint to consider. The discussions included whether two 250 foot towers located in the industrial or industrial transitional zone would meet Sprint's needs, and whether it would be feasible for Sprint's proposed towers to be lower.

At a special meeting held on September 3, 1996, the Board adopted a resolution "to declare a positive environmental impact" pursuant to SEQRA regarding the three proposed sites. The resolution indicated that there might be some potentially significant adverse environmental impact associated with Sprint's proposals, roughly described as impact on property values, visual impact and "cumulative impacts" of the proposed facilities and possible future facilities. Subsequently, the Board determined to hold a "scoping session" pursuant to SEQRA requiring Sprint to perform visual simulations of the proposed towers. The "scoping session" was conducted on September 17, 1996.

The visual impact analysis by balloon tests and photographic simulations was completed by February, 1997 and Sprint submitted the DEIS for each site on or about April 20, 1997. At its May 20, 1997 meeting, the Board accepted the DEIS as complete, and, after a public hearing on July 8, 1997, Sprint submitted a FEIS to the Board on August 8, 1997.

At a special meeting on August 26, 1997, the Board considered the FEIS together with signal propagation data submitted by Sprint, detailing why Ontario should be treated as suburban, requiring more towers, rather than rural. At the meeting, town representatives pointed out that neighboring towns, similar in many respects to Ontario, were classified as rural and requested that Sprint submit signal propagation data for the other towns as well, which Sprint did on September 24, 1997. However, the propagation data submitted by Sprint depicted only areas covered by signals strong enough to penetrate buildings ("in-building coverage"), as compared to signal propagation data for the lesser signal strength required to penetrate the skin of a vehicle ("in-vehicle coverage"). The Board was able to obtain propagation data for in-vehicle coverage from the neighboring towns, and assessed it together with the data submitted by Sprint. On September 25, 1997, the Board, faced with a choice between three towers or none, concluded that Sprint had failed to mitigate the environmental impact to the largest extent practicable and denied the application.

Sprint challenged the Board's decision under the Telecommunications Act as well as under New York State law in an action before Judge Michael A. Telesca in the United States District Court for the Western District of New York. Judge Telesca upheld the Planning Board's decision and granted the Board's motion for summary judgment. *See Sprint Spectrum, L.P. v. Willoth*, 996 F.Supp. 253, 259 (W.D.N.Y. 1998). Sprint appealed.

## DISCUSSION

On appeal, Sprint argues that (1) the Planning Board does not have the authori-

ty to compel a lesser level of service than the carrier has deemed necessary to compete effectively; (2) the Board's decision is not supported by substantial evidence and therefore violates the Telecommunications Act; (3) the Board unreasonably discriminated against Sprint by subjecting it to more onerous regulation than another existing cellular provider; and (4) under New York law, the Board did not have authority to deny Sprint's applications for the reasons stated.

We review *de novo* the district court's determination on a motion for summary judgment. *See, e.g., Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 492 (2d Cir.1999); *Fax Telecommunicaciones Inc. v. AT & T*, 138 F.3d 479, 485 (2d Cir.1998).

## I. The Telecommunications Act Claims

The Telecommunications Act of 1996 ("TCA"), codified at 47 U.S.C. § 151 *et seq.*, is an omnibus overhaul of the federal regulation of communications companies, intended:

> to provide for a pro-competitive, deregulatory national policy framework

designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition....

H.R. Conf. Rep. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 124; *see also Cellular Tel. Co.*, 166 F.3d at 493 (citing conference report). In furtherance of this goal, Congress enacted 47 U.S.C. § 332(c)(7)[1] which limits the state and local government's authority to deny construction of wireless telecommunications towers, *see id.* § 332(c)(7)(B)(i), and regulates how such decisions must be made, *see id.* §§ 332(c)(7)(B)(ii)-(iv). Although the TCA preserves local zoning authority in all other respects over the siting of wireless facilities, *id.* § 332(c)(7)(A), "the method by which siting decisions are made is now subject to judicial oversight. Therefore, denials subject to the TCA are reviewed by this court more closely" than are other types of zoning decisions to which federal courts generally accord great deference. *Cellular*

---

1. 47 U.S.C. § 332(c)(7) provides as follows:
Preservation of local zoning authority
(A) General authority
Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
(B) Limitations
(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
(I) shall not unreasonably discriminate among providers of functionally equivalent services; and
(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.
(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

*Tel. Co.,* 166 F.3d at 493 (internal citation omitted).

The two principal limitations on local zoning authority, both of which are at issue in this case, are found in subsection B(i), which provides that state and local regulation of "the placement, construction, and modification of personal wireless service facilities ... (I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i).

 A denial of a request to build wireless facilities must be "in writing and supported by substantial evidence contained in a written record," *id.* § 332(c)(7)(B)(iii), and not contrary to the limits on town authority set forth in *id.* § 332(c)(7)(B)(i). Whether a decision is supported by substantial evidence must be determined according to " 'the traditional standard used for judicial review of agency actions.' " *Cellular Tel. Co.,* 166 F.3d at 494 (quoting H.R. Conf. No. 104–458, at 208 (1996) *reprinted in* 1996 U.S.C.C.A.N. 124, 223). Substantial evidence requires evaluation of the entire record, including opposing evidence, *see American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981), and requires a decision to be supported by "less than a preponderance but more than a scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Cellular Tel. Co.,* 166 F.3d at 494 (quoting *Universal Camera v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

### A. The Unreasonable Discrimination Claim

 Sprint claims it has been subjected to unreasonable discrimination in violation of subsection B(i)(I) because its application was treated less favorably than that of Frontier Corp., a cellular provider whose application for a single tower in the town's industrial area was approved by the Town Board in 1993. The record is sparse on this issue, but Sprint appears to base its claim on two grounds. First, Sprint asserts, and the Planning Board concedes, that Frontier did not have to undergo the extensive environmental review process with which Sprint had to contend. Second, Sprint points out that Frontier was permitted to construct a tower, consistent with its coverage plan, that allows it to provide in-building coverage, whereas Sprint's application for the three towers it requires to provide in-building coverage was denied.

Sprint has produced no direct evidence that Frontier provides greater coverage than Sprint would be able to if it were to site one or two towers in less sensitive parts of town. Sprint only points out that PCS systems (like Sprint's) require more towers than do analog cellular systems (like Frontier's) to provide the same level of service. This is because the analog cellular system operates at a comparatively higher power and lower frequency.

We assume, *arguendo,* that the Board's treatment of Sprint's application could be construed as discriminatory because (1) Sprint, but not Frontier, was required to undergo a time-consuming and costly environmental quality review procedure, and (2) the Board's denial of Sprint's three tower application could disable Sprint from matching Frontier's level of coverage. Even so, we think that the Planning Board's actions still would not be "unreasonable" within the meaning of subsection B(i)(I). "[T]he Act explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed. Any discrimination need only be reasonable." *AT & T Wireless PCS, Inc. v. City Council of Va. Beach,* 155 F.3d 423, 427 (4th Cir.1998) (internal quotation marks omitted). The legislative history of the TCA contemplated that the very form of discrimination asserted by Sprint would occur and should be permitted.

[T]he phrase "unreasonably discriminate among providers of functionally equivalent services" will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services. For example, the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50-foot tower in a residential district.

H.R. Conf. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222.

■ In other words, local governments may reasonably take the location of the telecommunications tower into consideration when deciding whether: (1) to require a more probing inquiry, and (2) to approve an application for construction of wireless telecommunications facilities, even though this may result in discrimination between providers of functionally equivalent services. *See AT & T Wireless PCS,* 155 F.3d at 427 (discrimination based on traditional bases of zoning regulation such as preserving character of neighborhood and avoiding aesthetic blight not unreasonable). As far as the record reveals, that is what occurred in this case. Thus, we reject Sprint's unreasonable discrimination claim.

## B. The Prohibiting Services Claim

■ Sprint claims that the Planning Board's refusal to approve its application to construct three towers "prohibit[s] or [has] the effect of prohibiting the provision of personal wireless services" in violation of subsection (B)(i)(II).

The essence of Sprint's argument is that it has the right under this provision of the TCA to construct any and all towers that, in its business judgment, it deems necessary to compete effectively with other telecommunications providers, wireless or not. Otherwise, Sprint argues in substance, the effect will be to "prohibit ... the provision of personal wireless services." This untenable position founders on the statutory language. Since Sprint admits it would never propose to build towers it deems unnecessary to compete successfully, a fact which undoubtedly will hold true for most service providers, such a rule would effectively nullify a local government's right to deny construction of wireless telecommunications facilities, a right explicitly contemplated in 47 U.S.C. § 332(c)(7)(B)(iii). *See AT & T Wireless PCS,* 155 F.3d at 428.

In support of its claim to provide services as it sees fit, Sprint points to the TCA's purposes "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub.L. No. 104–104, 100 Stat. 56, preamble (1996). Sprint also argues correctly that some of the competition contemplated by the TCA may come from personal wireless services, since such services can be a substitute for traditional land-line based systems. *See* 47 U.S.C. § 332(c)(3)(A) (commercial mobile service providers not exempt from state-imposed universal availability requirements "where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State").

We do not read the TCA to allow the goals of increased competition and rapid deployment of new technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities. *See Town of Amherst v. Omnipoint Communications Enter.,* 173 F.3d 9, 13 (1st Cir.1999) ("47 U.S.C. § 332(c)(7), is a deliberate compromise between [the] two competing aims"). In the context of constructing a national wireless telecommunications infrastructure, Congress chose to preserve all local zoning authority "over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47

U.S.C. § 332(c)(7)(A), subject only to the limitations set forth in section 332(c)(7)(B). Sprint's ability to compete with land-line based services simply is not part of the inquiry under subsection B. Subsection B(i)(I) speaks only to Sprint's ability to compete with "functionally equivalent services," which does not include land-line services. *See* H.R. Conf. Rep. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222 ("When utilizing the term 'functionally equivalent services' the conferees are referring only to personal wireless services that directly compete against one another."). Because subsection B(i)(II) only considers whether a town's decision will have the effect of prohibiting personal wireless services in a given area, Sprint's reliance on that subsection to contend that it cannot be prohibited from competing effectively with land-line systems is misplaced.

Moreover, mandating approval of all wireless facilities would act as a disincentive for wireless service providers to develop and deploy new technology that will provide better transmission and reception with less intrusive towers, effectively undermining the TCA's goal of increased innovation. *See generally* Elizabeth A. Nowicki, *Competition in the Local Telecommunications Market: Legislate or Litigate?*, 9 Harv. J.L. & Tech. 353 (1996) (discussing innovation in light of the goals of the TCA).

■ The Planning Board's principal argument to the contrary is equally untenable. Quoting at length from *AT&T Wireless PCS, Inc. v. City Council of Va. Beach*, 979 F.Supp. 416, 426–27 (E.D.Va. 1997), *aff'd in part, rev'd in part*, 155 F.3d 423 (4th Cir.1998), the Board argues in substance that subsection B(i)(II) must be read as prohibiting only general bans. Absent an explicit policy banning personal wireless services, the Board contends, courts can only consider whether in aggregate a town's repeated denials of applications have the effect of a general ban. Since Ontario does not have a general ban.

in effect, as evidenced by its earlier approval of Frontier's application and professed willingness to accept some level of PCS service, the Board insists its actions must necessarily be in conformance with subsection B(i)(II). We disagree with this reasoning.

■ The Planning Board's interpretation would essentially convert subsection B(i)(II) into a simple directive to consider applications on a case-by-case basis. *See AT & T Wireless PCS*, 155 F.3d at 428. However, such a requirement is already explicitly found elsewhere in the statute. Subsection B(ii) requires local governments to act on an application, and subsection B(iii) requires a denial to be in writing and supported by substantial evidence in the record. Together these sections constitute a clear mandate to consider applications on a case-by-case basis. The Board's reading would therefore render the language "or have the effect of prohibiting" in subsection B(i)(II) duplicative. It is a well-settled rule of statutory construction that "courts should disfavor interpretations of statutes that render language superfluous." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *see also Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Westwood Pharm., Inc. v. National Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir.1992). Since the Planning Board's interpretation would run counter to the TCA's stated goals, and since the plain language of the statute compels a solution that accommodates the TCA's purposes and that does not render any portion of subsection B(i)(II) superfluous, we refuse to adopt the Board's interpretation.

Construing subsection B(i)(II) to apply only to general bans would lead to the conclusion that, in the absence of an explicit anti-tower policy, a court would have to wait for a series of denied applications before it could step in and force a local government to end its illegal boycott of

personal wireless services. That solution does not fit well or easily within the statutory scheme of expedited appeal set forth in subsection B(v) and the preferred remedy of imposing injunctive relief on local governments that impermissibly deny tower construction applications. *See Cellular Tel. Co.*, 166 F.3d at 497. Interpreting subsection B(i)(II) as only prohibiting general bans also would lead to the untenable result that once personal wireless services are available somewhere within the jurisdiction of a state or local government, whether by virtue of a facility located outside or inside its borders, the state or local government could deny any further applications with impunity. *See, e.g., Sprint Spectrum, L.P. v. Town of N. Stonington*, 12 F.Supp.2d 247, 256 (D.Conn.1998) (no general ban and no violation of subsection B(i)(II) where town had approved a prior application to modify a tower). Although attractively simple, such an interpretation is contrary to the TCA's intent to "encourage the rapid deployment of new telecommunications technologies." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 2337–38, 138 L.Ed.2d 874 (1997) (quotation omitted).

We believe that what is meant by the Act's proscription that local government regulation of wireless service facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services" lies between the extreme positions argued by Sprint and the Planning Board. The question for us to resolve is what Congress meant by "personal wireless services." The plain statutory language of subsection B(i)(II) read in conjunction with the appropriate definitions set forth in the TCA provides the answer.

"It would be [a] gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity." *AT & T Corp. v. Iowa Utils. Bd.*, —— U.S. ——, 119 S.Ct. 721, 738, 142 L.Ed.2d 835 (1999). Our task, regrettably, requires a detailed parsing of the statutory language, including layers of highly technical definitions. From this exercise, however, we conclude that the parameters of the statutory proscription of local government's prohibition of "personal wireless services" in the context of this case depends upon a conception of "personal wireless services" that is the equivalent of the ability of mobile, handheld telephones to reach a cell site that provides access to a land-line exchange and allows phone calls to be made to and from the national telephone network.

"Personal wireless services" is defined, if somewhat opaquely, as "[1] commercial mobile services, [2] unlicensed wireless services, and [3] common carrier wireless exchange access services." 47 U.S.C. § 332(c)(7)(C)(i). Each of the three individual terms are further defined in the TCA, although some of the definitions are lacking in both clarity and apparent usefulness.[2] Each will be considered in turn.

1. "Commercial mobile services" is essentially defined as mobile service for profit that makes interconnected service available to the public. *See id.* § 332(d)(1).[3] "Interconnected service" is in turn defined as "service that is interconnected with the public switched network...." *Id.* § 332(d)(2).[4] The FCC defines "public

---

**2.** For instance, "mobile station" which is part of the definition of mobile service, is defined as "a radio-communication station capable of being moved and which ordinarily does move," 47 U.S.C. § 153(28), and "land station," also a part of the definition of mobile service, is defined as "a station, other than a mobile station, used for radio communication with mobile stations," *id.* § 153(23). Together, these two definitions are best described as much ado about nothing.

**3.** The term "commercial mobile service" is defined as

> any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission.

47 U.S.C. § 332(d)(1).

**4.** The term "interconnected service" is defined as

switched network," as "[a]ny common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use the North American Numbering Plan in connection with the provision of switched services," 47 C.F.R. § 20.3, which in plain language means the public telephone network. *See id.* § 68.2. "Mobile service" is defined in pertinent part as "a radio communication service carried on between mobile stations or receivers and land stations." 47 U.S.C. § 153(27).[5] "Commercial mobile services" therefore means a for profit radio communication services carried on between mobile stations or receivers and land stations that are connected to the national telephone network.

2. "Unlicensed wireless services," is defined as "the offering of telecommunications services using duly authorized devices which do not require individual licenses. . . ." *Id.* § 332(c)(7)(C). Since Sprint's PCS network requires a license, that part of the definition is not relevant to this case.

3. "Common carrier wireless exchange access services," as with other definitions in this statutory maze, consists of several individually defined terms. Sprint is a "common carrier" as defined in *id.*

§ 153(10), because it offers its common carrier services for hire,[6] and this definition therefore is pertinent to this case. "Exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." *Id.* § 153(16). In other words, this part of the definition of "personal wireless services" deals with the ability to make and receive telephone calls using wireless equipment.

For the reader who has chosen to follow this exercise, the end is near. Putting together the first and third components of the definition of "personal wireless services," those relevant to this case, we can conclude that the local government is proscribed from prohibiting for-profit radio communication services carried on between mobile stations or receivers and land stations that (1) are connected to the national telephone network and that (2) provide wireless phones with access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.

By speaking in terms of communications between land stations (cell sites that connect directly to land-lines) and mobile stations (wireless telephones) and access to

---

service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section.
47 U.S.C. § 332(d)(2).

5. The term "mobile service" is defined as

a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of oper-

ation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled "Amendment to the Commission's Rules to Establish New Personal Communications Services" (GEN Docket No. 90–134; ET Docket No. 92–100), or any successor proceeding.
47 U.S.C. § 153(27).

6. The term "common carrier" or "carrier" is defined as

any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.
47 U.S.C. § 153(10).

facilities necessary to make and receive phone calls, the plain focus of the statute is on whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network. In our view, therefore, the most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines.

The Planning Board argues that our interpretation would render illusory the town's right to deny applications, a right contemplated in subsection B(iii). *See also AT & T Wireless PCS,* 155 F.3d at 428. We disagree.

A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means. *See Town of Amherst,* 173 F.3d at 14 ("[I]ndividual denial is not automatically a forbidden prohibition," but disallowing "the only feasible plan . . . might amount to prohibiting personal wireless service."). There are numerous ways to limit the aesthetic impact of a cell site. It may be possible to select a less sensitive site, *see Gearon & Co. v. Fulton County,* 5 F.Supp.2d 1351, 1355 (N.D.Ga.1998), to reduce the tower height, *see Town of Amherst,* 173 F.3d at 14–15, to use a preexisting structure or to camouflage the tower and/or antennae, *see, e.g., Cellco Partnership v. Town Plan & Zoning Comm'n of Farmington,* 3 F.Supp.2d 178, 185, 186 (D.Conn.1998) (describing antennae placed on water tower, and permitting applicant to reconstruct church steeple with six antennae placed inside); *Smart SMR of New York, Inc. v. Zoning Comm'n of Stratford,* 995 F.Supp. 52, 59 (D.Conn.1998) (describing an antenna placed on a billboard and current applicant

seeking to conceal tower with seven evergreen trees). *See also* Nancy D. Holt, *Developments: It May Be Art, But Can You Hear Me?,* Wall St. J., Dec. 10, 1997, at B14 (describing a multitude of camouflaged towers ranging from artful designs to silos, windmills, cactuses and pine trees). A local government may also reject an application that seeks permission to construct more towers than the minimum required to provide wireless telephone services in a given area. A denial of such a request is not a prohibition of personal wireless services as long as fewer towers would provide users in the given area with some ability to reach a cell site.

■ Furthermore, once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader: State and local governments may deny subsequent applications without thereby violating subsection B(i)(II). The right to deny applications will still be tempered by subsection B(i)(I), which prohibits unreasonable discrimination. However, it is not unreasonably discriminatory to deny a subsequent application for a cell site that is substantially more intrusive than existing cell sites by virtue of its structure, placement or cumulative impact. We hold only that the Act's ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines.

■ Turning to Sprint's application in this case, the evidence in the record establishes that two towers and possibly even a single tower would allow Sprint to provide in-vehicle coverage throughout the entire town of Ontario, and in-building coverage throughout most of it, including the more densely populated areas. Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases)

the lack of coverage likely will be *de minimis* so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service. *See Wisconsin Dep't of Revenue v. Wrigley, Jr., Co.*, 505 U.S. 214, 231, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992) (*De minimis* principle "is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept."). *See also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Hudson v. McMillian*, 503 U.S. 1, 8–9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Abbott Lab. v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 18, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976); *Industrial Ass'n of San Francisco v. United States*, 268 U.S. 64, 84, 45 S.Ct. 403, 69 L.Ed. 849 (1925).

Because there is substantial evidence in the record to support the conclusion that virtually all of Ontario could be serviced with fewer than three towers, the Planning Board did not violate subsection B(i)(II)'s ban on prohibiting personal wireless services by rejecting Sprint's all or nothing application. *See Town of Amherst*, 173 F.3d at 14 (no prohibition of personal wireless services where "lower towers could be used (and possibly resited)").

## II. *The State Law Claims*

■ The TCA imposes limits on the authority of state and local governments to restrict personal wireless services. The TCA itself does not provide the legal basis to deny an application to construct a personal wireless facility. That authority must be found in state or local law. In this case, it is state law that prescribes the Planning Board's obligation to deny a site plan that does not satisfy SEQRA's substantive and procedural requirements. *See* N.Y. Town L. § 274–a(10) (McKinney Supp.1998).

An agency may not approve an action unless it makes "an explicit finding that the requirements of [SEQRA] have been met and that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided[,]" [N.Y. Envtl. Conserv. L. § 8–0109(8); *see*, N.Y. Comp. Codes R. & Regs. tit. 6, § 617.9(c)(2)(i) ], and that, "consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided by incorporating as conditions to the decision those mitigative measures which were identified as practicable[,]" [N.Y. Comp.Codes R. & Regs. tit. 6, § 617.9(c)(2)(ii) ].

*Jackson v. New York State Urban Dev. Corp.*, 67 N.Y.2d 400, 416, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986).

The Board found: (1) that Sprint's proposed towers would be visible over a large area and have a negative visual impact, measurable *inter alia* by a substantial decline in the value of stigmatized properties; (2) that approving Sprint's application could set a precedent that would require the Board to accept numerous towers in sensitive areas which cumulatively would result in a significant negative environmental impact; and (3) that there appeared to be alternatives open to Sprint involving fewer than three towers that would reduce the environmental impact while still providing Sprint with an acceptable coverage level. Consequently, the Planning Board denied the application concluding that "the action to construct three monopole telecommunications towers [at the proposed sites] will have adverse environmental impacts which have not been mitigated by the applicant." Sprint challenges the Board's SEQRA determinations

on numerous grounds, none of which have merit.

■ Judicial review of the Planning Board's SEQRA determinations is guided by the normal standards applicable to administrative proceedings. *See Jackson,* 67 N.Y.2d at 416, 503 N.Y.S.2d 298, 494 N.E.2d 429. We will annul an agency's determination only "[w]here [the] agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision was not rational, or is arbitrary or capricious or not supported by substantial evidence...." *WEOK Broad. Corp. v. Planning Bd. of Lloyd,* 79 N.Y.2d 373, 383, 583 N.Y.S.2d 170, 592 N.E.2d 778 (1992). This standard of review is essentially identical to, and therefore in conformance with, the requirements set forth in the TCA that "[a]ny decision ... to deny a request to place ... personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 42 U.S.C. § 332(c)(7)(B)(iii). *See Cellular Tel. Co.,* 166 F.3d at 494. "Whether an administrative agency determination is shored up by substantial evidence is a question of law to be decided by the courts." *300 Gramatan Ave. Assocs. v. State Div. Of Human Rights,* 45 N.Y.2d 176, 181, 408 N.Y.S.2d 54, 379 N.E.2d 1183 (1978).

■ Sprint erroneously claims that the Board could not deny its site plan because the local zoning law permits public utilities at Sprint's proposed tower sites, and wireless telephone companies are public utilities under New York law. *See Cellular Tel. Co. v. Rosenberg,* 82 N.Y.2d 364, 371, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993). While "SEQRA review may not serve as a vehicle for adjudicating legal issues concerning compliance with local government zoning," *WEOK Broad. Corp.,* 79 N.Y.2d at 382, 583 N.Y.S.2d 170, 592 N.E.2d 778 (internal quotations omitted), and the Planning Board may not "disapprove a [permitted] use under the guise of denying site plan approval," *Mialto Realty, Inc. v. Town of Patterson,* 112 A.D.2d 371, 491 N.Y.S.2d 825, 825 (2d Dep't 1985) the Board is still vested with considerable discretion in deciding whether to approve or reject a proposed project. *See, e.g., Exxon Corp. v. Gallelli,* 192 A.D.2d 706, 597 N.Y.S.2d 139, 139 (2d Dep't 1993); *Orchards Assocs. v. Planning Bd. of N. Salem,* 114 A.D.2d 850, 494 N.Y.S.2d 760, 762 (2d Dep't 1985). Sprint therefore does not have an absolute right to construct its towers simply because their construction constitutes a permitted use.

■ We also reject Sprint's related argument that by including "utility substations" in the local zoning law,[7] the Ontario lawmakers have made a legislative finding that Sprint's proposed towers would not conflict with the character of the neighborhood and that the Board therefore was prevented from considering their aesthetic impact.

■ Aesthetics is generally a valid subject of municipal regulation and concern both under the Planning Board's review of a site plan, *see Suffolk Outdoor Adver. Co. v. Hulse,* 43 N.Y.2d 483, 490, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977); *Exxon Corp.,* 597 N.Y.S.2d at 139, and under SEQRA, *see WEOK Broad. Corp.,* 79 N.Y.2d at 385, 583 N.Y.S.2d 170, 592 N.E.2d 778. While there are times when "the inclusion of a permitted use in a local zoning ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the local commu-

---

7. During the pendency of Sprint's application, the Town of Ontario amended its zoning ordinance. However, the amendment does not affect this discussion. Both the old and the new zoning ordinance permit "utility substations," subject to the Planning Board's approval of the site plan. In deciding whether to approve a site plan, the Planning Board must consider the effect of approval on neighborhood character. *Compare* Town of Ontario Local L. Jan. 1988 §§ 150–37(A)(4) & 150–39 (effective Jan. 19, 1988) *with* Town of Ontario Local L. No. 1 of 1996 §§ 150–26(C)(8) & 150–37 (adopted June 24, 1996).

nity," *WEOK Broad. Corp.,* 79 N.Y.2d at 383, 583 N.Y.S.2d 170, 592 N.E.2d 778, the fact that the towers constitute a permitted use is "by no means determinative," *id.* A local zoning ordinance permitting a specific type of structure, such as radio or television towers, may give rise to a presumption "that the aesthetic visual impact of the towers was ... considered at the time that radio and television towers were included as permitted uses in the ... zone." *Id.* But no such presumption is warranted here because the pertinent zoning ordinance permits "utility substations," a term encompassing a multitude of structures. This general term does not support the inference that the Ontario Town Board considered and accepted the aesthetic impact of telecommunications towers. To the contrary, a natural reading of the applicable zoning ordinance is that the Town Board left open for future consideration by the Planning Board on a case-by-case basis the compatibility between a proposed structure and the affected neighborhood. Consequently, the Planning Board is neither precluded from evaluating the aesthetic impact of Sprint's proposal, nor must it overcome a presumption that Sprint's towers are in conformance with the neighborhood character.

■ The Board's decision to reject Sprint's application on aesthetic grounds will be impervious to attack in the courts where "the Board ... has made a reasoned elaboration resulting from its 'hard look' pursuant to SEQRA review such that it can be concluded that its findings and determination are supported by substantial evidence," *id.* and is not otherwise "affected by an error of law, or its decision was not rational, or is arbitrary or capricious...." *Id; see Pittsford Plaza Assocs. v. Spiegel,* 66 N.Y.2d 717, 718, 496 N.Y.S.2d 992, 487 N.E.2d 902 (1985).

■ Substantial evidence is "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact or the kind of evidence on which responsible persons are accustomed to rely in serious affairs." *WEOK Broad. Corp.,* 79 N.Y.2d at 383, 583 N.Y.S.2d 170, 592 N.E.2d 778 (internal quotation marks and citations omitted). "In final analysis, substantial evidence consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably probatively and logically." *300 Gramatan Ave. Assocs.,* 45 N.Y.2d at 181, 408 N.Y.S.2d 54, 379 N.E.2d 1183 (citations omitted).

■ Sprint's contrary assertions notwithstanding, the evidence in the record before us is more than adequate to support the Planning Board's conclusion that Sprint's three tower proposal would have a significant negative aesthetic impact. Sprint submitted information about minimum tower height requirements and photographic simulations, admitting that "[b]y necessity, the tower will be visible from a wide area surrounding the site." The real estate experts consulted by the Planning Board stated that the towers would have a stigmatizing effect based in part on aesthetics which would reduce the buyer pool, leading to a 10% to 25% reduction in property values. The stigmatizing effect is substantiated by a letter written by Sprint's attorney to the neighboring town of Walworth's planning board, explaining Sprint's difficulties in finding alternate property sites. A real estate expert hired by Sprint even admitted that "a diminished supply of potential buyers ... concededly may exist for a property which views or is in the vicinity of a nearby tower installation," but predicted that the property value would not be affected. The Planning Board was, of course, entitled to disregard that prediction where two of its own real estate experts concluded otherwise. *See, e.g., Orchards Assocs.,* 494 N.Y.S.2d at 762 (SEQRA determination supported by substantial evidence where experts hired by town arrived at different conclusion than petitioner's expert).

■ Sprint's argument that the Planning Board impermissibly based its SEQRA determination on the decline in property values, an economic harm outside the scope of SEQRA, is misguided. While "[e]conomic injury is not by itself within SEQRA's zone of interests," *Society of the Plastics Indus., Inc.*, 77 N.Y.2d at 777–78, 570 N.Y.S.2d 778, 573 N.E.2d 1034, an agency is not precluded from considering economic injury in determining whether a negative aesthetic impact is significant. *But see Cellular Tel. Co.*, 166 F.3d at 496 (decline in property value potentially impermissible consideration under the TCA if used as a proxy for environmental effects of radio frequency radiation). Used in this manner, the decline in property values constitutes "such relevant proof as a reasonable mind may accept ... to support [the] conclusion" that the towers would have a significant negative environmental impact, *WEOK Broad. Corp.*, 79 N.Y.2d at 383, 583 N.Y.S.2d 170, 592 N.E.2d 778, and therefore properly considered under SEQRA. The record shows that the Planning Board did not commit the error of treating the reduced property values as an injury recognized under SEQRA, but permissibly considered the economic harm to establish "the measurable nature of the impact of having towers in residential settings."

■ The Planning Board also found that approving Sprint's application would set a precedent that could "result [in] ... a large number of towers in the town," and concluded that "the cumulative impact of multiple towers would have a significant environmental impact on the Town of Ontario." Sprint challenges this analysis, arguing that the Planning Board could not consider the cumulative impact of future applicants because no applications were currently pending. We disagree. An agency making a SEQRA determination is required to consider the cumulative impact of its action when applications are related, *see Save the Pine Bush, Inc. v. City of Albany*, 70 N.Y.2d 193, 205–06, 518 N.Y.S.2d 943, 512 N.E.2d 526 (1987), and it "may choose, in its discretion, [to examine or] not to examine the cumulative impact of separate applications within the same geographic area." *Id.* at 205, 518 N.Y.S.2d 943, 512 N.E.2d 526. Sprint's DEIS stated that two other PCS providers, Omnipoint and AT & T, had been licensed by the FCC to provide PCS service to the Town of Ontario, and recent hiring activities indicated that at least one of these would soon begin deployment in the area. Given the Planning Board's correct determination that it could not discriminate between providers, the nexus between Sprint's application and the identified cumulative effects is so close that the Planning Board acted well within its discretion in considering the cumulative effects of Sprint's application.

■ Sprint's final argument is that under New York law it has a right to construct those cell sites it deems necessary to provide adequate service to its customers, preventing the Board from considering alternatives providing less coverage when determining whether Sprint's proposal minimized the environmental impact to the largest extent practicable. This argument also fails.

The New York Court of Appeals held in the seminal case of *Cellular Telephone Co. v. Rosenberg* that applications for the construction of cell sites necessary to remedy gaps in a service area that currently prevent a wireless service provider from providing adequate service to its customers are subject to a more lenient treatment under zoning laws, *see Cellular Tel. Co.*, 82 N.Y.2d at 373–74, 604 N.Y.S.2d 895, 624 N.E.2d 990, especially where the " 'intrusion or burden on the community is minimal,' " *id.* at 372, 604 N.Y.S.2d 895, 624 N.E.2d 990 (quoting *Consolidated Edison Co. v. Hoffman*, 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)). Sprint may even be entitled to a presumption that its proposed towers are necessary given that it has considered and rejected alternatives. *See Sprint Spectrum, L.P. v.*

*Zoning Bd. of Appeals of Guilderland,* 173 Misc.2d 874, 662 N.Y.S.2d 717, 719 (N.Y.Sup.Ct.1997). However, the evidence in the record before us adequately supports the Planning Board's conclusion that Sprint could remedy its service gaps by using fewer than three towers and that the aesthetic impact of Sprint's proposed towers would be significant. New York State law therefore does not give Sprint the right to construct three towers in Ontario at this time.

### Conclusion

Affirmed. Costs of the appeal will be borne by Sprint.