**NEW YORK SMSA LIMITED PARTNERSHIP d/b/a Verizon Wireless (f/k/a Bell Atlantic Mobile) and Crown Atlantic Company LLC, Plaintiffs,**

v.

**The TOWN OF CLARKSTOWN; The Town of Clarkstown Planning Board; and Adolph Milch, Building Inspector of the Town of Clarkstown, Defendants.**

No. 00Civ. 3029(CM).

United States District Court, S.D. New York.

May 26, 2000.

Leslie J. Snyder, Snyder & Snyder, Tarrytown, NY, for plaintiffs.

Daniel N. Kraushaar, Nanuet, NY, for Municipal, defendants.

William Harrington, Bleakley Platt & Schmidt, LLP, White Plains, NY, for intervenor–defendant Goosetown.

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiffs, a wireless provider and the builder of its monopole facilities, bring this action pursuant to the Federal Telecommunications Act of 1996, 47 U.S.C. § 332 ("TCA") asking the Court for a mandatory injunction compelling Defendants to issue a permit for Plaintiffs to build a wireless monopole in the Town of Clarkstown. For the reasons stated below, the requested injunction is denied, Defendants' cross-motion for summary judgment is granted, and the case is dismissed.

## I. The Parties and Procedural Posture

Plaintiff SMSA Limited Partnership ("SMSA"), doing business as Verizon Wireless (formerly known as Bell Atlantic Mobile, hereinafter "BAM"), is licensed by the Federal Communications Commission to provide wireless telecommunications service within the Town of Clarkstown and surrounding areas. Plaintiff Crown Atlantic Company, LLC ("Crown Atlantic") is a joint venture between Verizon Wireless and Crown Castle International Corporation, and is responsible for the construction of wireless facilities like the one at issue in this lawsuit.

Plaintiffs bring suit against Defendant Clarkstown, New York (the "Town"), the Clarkstown Planning Board, and Adolph Milch, Clarkstown Building Inspector, on the grounds that the Town's denial of Plaintiffs' application to construct a monopole that would provide wireless service in the Congers section of Clarkstown violated their statutory rights under the TCA and various state and federal constitutional rights under the United States and New York Constitutions.

Plaintiffs filed this action on April 20, 2000, together with an order to show cause seeking injunctive relief. On May 2, 2000, the Court determined that Goosetown Enterprises, Inc., doing business as Goosetown Communications ("Goosetown"), was a necessary party to this suit and granted it status as a Defendant Intervenor. Goosetown is a telecommunications company located in Clarkstown that, like Plain-

tiffs, submitted an application to construct a wireless facility that would provide coverage in Congers. Goosetown was the successful applicant.

## II. The Facts

There is a gap in wireless telephone service in the Congers area of Clarkstown. In order to remedy the gap, three separate wireless providers, Goosetown, SMSA and Sprint Spectrum, LLP ("Sprint"), not a party to this suit, each sought approval from the Clarkstown Planning Board to construct a monopole wireless facility. Sprint applied on April 11, 1997 for permission to build at Lot 129.A5.5 at 33 Route 59 in Congers. Goosetown applied for a special use permit on June 3, 1999 to build at Lot 142/129.A.5.09 in Congers. SMSA proposed to build at 35 Hemlock Drive (the "Soffer site"). Plaintiffs were the last to apply for a special use permit, which they did on August 4, 1999.[1]

According to the Clarkstown Wireless Law, co-location of wireless communications providers is the primary consideration in granting special permit approval, since co-location minimizes the number and visual impact of monopoles.[2] The Town therefore makes every effort to select a single tower location that meets the technical and coverage needs of the wireless carriers, while at the same time meeting the Town's safety and visual impact considerations. Clarkstown hoped to select only one applicant to build a monopole that would fill the coverage gap; the other carriers would be required to co-locate on that facility.

Defendant Goosetown first discussed its application with the Planning Board's Technical Advisory Committee on September 23, 1998. On March 3, 1999, another meeting with the Technical Advisory Committee was held, at which both Sprint and SMSA were also present (although SMSA had not yet filed an application to build a facility). Goosetown contends that, at this second meeting, the Advisory Committee stated its preference for the Goosetown site over the other two, on the grounds that it was in a more remote area and would have the least visual impact. According to Goosetown, the Committee also noted that the Goosetown site was the best situated with respect to businesses, schools and homes. After incorporating changes to its site plan recommended by the Technical Advisory Committee, Goosetown submitted its formal application for a special use permit on June 4, 1999.

A public hearing was held on the Goosetown application on July 14, 1999. Some members of the public expressed opposition to the site. At the conclusion of the public hearing, the Town's planning, environmental and wireless communications consultants all gave the Goosetown application a positive recommendation to the Planning Board.

In order to reach an agreement on colocation for the other wireless carriers in the Congers area, the Planning Board required Goosetown and other cellular carriers, including SMSA, to attend another Technical Advisory Committee meeting. The follow-up Advisory Committee Meeting was held on August 4, 1999. At that meeting, SMSA, Sprint, Nextel, AT & T Wireless and Omnipoint all indicated that the Goosetown site would meet their coverage needs.

However, on the very same day, SMSA submitted its own application for a special

---

1. There is some confusion in the record and the parties' submissions as to the dates on which Goosetown and SMSA first "applied" to build. Goosetown contends that it submitted its initial application for the site to the Planning Board on September 4, 1998. It is undisputed, however, that Goosetown applied for the special use permit on June 3, 1999, and SMSA applied on August 4, 1999.

2. See Local Law 17 of 1996, codified as Chapter 251 of the Clarkstown Town Code, at § 251–12(3) ("the facility service plan shall include ... a commitment to colocate or allow colocation wherever possible on all existing and proposed facilities.")

use permit. SMSA noted on its application that there was no existing tower on which BAM's antennas could be co-located in order to remedy the gap in coverage in Congers. On August 4, 1999, that statement was true, since the existing applications (by Goosetown and Sprint) had not been ruled on one way or the other. Plaintiffs' application was accompanied by the requisite environmental, visual impact and other technical analyses required under the Town Wireless Law. The environmental reports specifically indicated that the proposed facility would meet the maximum electromagnetic radio frequency exposure limits under the TCA.

Goosetown's application came before the Planning Board at the September 29, 1999 meeting, during which additional public comments on the Goosetown proposal were allowed. The Town's consultants reiterated their opinion that Goosetown was the preferred site, but no final vote was taken.

On October 21, 1999, BAM's Executive Vice President and Chief Technical Officer wrote to Goosetown expressing an interest in co-locating should Goosetown be the winning applicant:

> I appreciate the opportunity to have discussed the Congers, N.Y. cell site with you over the last few days.
>
> Bell Atlantic Mobile did engage Crown Castle to find us a cell site location in your town. *In spite of that engagement, please be assured that Bell Atlantic Mobile is willing to go on any one of the sites that is approved by the town.*

(Lynch Letter to Buto, October 21, 1999, attached to Gottlieb Decl. at Ex. I) (emphasis added).

On October 27, 1999, the Planning Board held a public hearing to discuss, seriatim, the pending applications of Sprint, SMSA and Goosetown. At that meeting, a few members of the public expressed concern about the visual impact and the possible health effects of SMSA's proposed site. But no decision was taken on the SMSA site and no date was set for further consideration of SMSA's application.

It was also at this meeting that the so-called "theory of prudent avoidance," which lies at the heart of this litigation, was first advanced to the Board. Members of the Board were given a copy of a chart prepared by Goosetown, which showed the distances of Goosetown's proposed monopole site from neighboring schools, business, ballfields and residences. Using the Goosetown chart as an aid, Morton Leifer, the Town's electronic communications consultant, told the Board that, while the SMSA site complied with FCC requirements, the Planning Board should adopt a policy of "prudent avoidance" to minimize the radio frequency emissions in the neighborhood. He argued, in essence, that if all applicants complied with the FCC radio frequency exposure limits (as they did), the Town could consider which site was situated farthest from key residential, business and recreational locations. He therefore recommended that the Board consider approving the Goosetown site, because it would produce the lowest level of radio frequency emissions at the schools, businesses and residences in Congers.

At the meeting, it was made clear that emissions levels themselves could not be the legal basis for approving or denying an application for a permit. In addressing that point, Leifer stated:

> Every site that is considered can only be considered if the exposure is below the [maximum exposure limits], then the town tries to mitigate even further the exposure by trying to maximize the distance from areas of interest. So we know that, and again, we don't claim any site is unsafe. We're not permitted to do that, but what we can do is mitigate the exposure, limit the exposure even further by making the distances as great as possible.

(Transcript of Oct. 27, 1999, Planning Board Meeting at 43, attached to Snyder Decl. at Ex. 4.)

After the public portion of the meeting was closed, the Planning Board discussed the Goosetown site, which was on the agenda for final review of its special permit application. The Board voted 4 to 3 to deny the application, on the basis that Goosetown had failed to comply with the local Wireless Law. Upon reconsideration, one member changed his vote and the Board voted to continue the matter.

On November 16, 1999, the CEO of Bell Atlantic Mobile wrote to Goosetown indicating that BAM was "prepared to locate on whatever tower is approved in Congers, provided it meets with our coverage requirements and the business terms are in line with industry norms." (Strigl Letter to Gottlieb, Nov. 16, 1999, attached to Gottlieb Decl. at Ex. F.) Goosetown exercised its option on the property for its proposed monopole on November 30, 1999.

The Planning Board's discussion of the SMSA, Goosetown and Sprint sites continued on December 1, 1999. At that meeting, counsel for SMSA told the Board that it could mitigate the visual impact of its site by constructing the 150–foot monopole to look like an evergreen tree. She also stated that SMSA would shift the location of the monopole so that it was further from the school and business sites than the Goosetown proposal. These revised plans were submitted for consideration.

The Town consultants present at the discussion stated that they had no further comments or questions of SMSA's counsel concerning the SMSA site. Planning Board member Heim inquired, however, whether a negative declaration under the New York State Environmental Quality Review Act ("SEQRA") would be prepared for the SMSA site.

The Chair of the Planning Board, Rudolph Yacyshyn, then noted that he had consulted with the Town Attorney, Paul Schofield, and that the Board was in a position, "officially for the record and formally" to "take a consensus of the Board" regarding the Congers monopole site selection. (Transcript of Dec. 1, 1999 Planning Board Meeting, attached to Snyder Decl. at Ex. 10, p. 16.) Board Member Richard Paris then moved: "I will make a motion, Mr. Chairman. My preference is for the Crown Atlantic [SMSA] site." (*Id.* at 17.) The motion carried by a vote of 3 to 2. (*Id.*) Mr. Paris continued:

> I further recommend, Mr. Chairman, *that the three matters be continued until our consultants have an opportunity to review the minutes and develop the proper negative declarations, the proper resolution for special permit, resolutions for the denial for the two applications that were not selected, and that the application that was accepted tonight is on the basis of the revised location submitted with the camouflaged rendering as provided just as direction.*

(*Id.* at 18.) (emphasis added).

The Board adopted this resolution by vote of 4–2.

SMSA contends the adoption of these two resolutions at the December 1 meeting constituted final approval of its site and denial of Goosetown's application (Sprint's site appears never to have been in the running). It so argues even though certain resolutions that were required in order to complete the approval process (including a SEQRA negative declaration and a written resolution by the Board) had not been adopted, or even drafted at that point. Nonetheless, it seems clear that if all the necessary resolutions had been available to be adopted, SMSA would have won the day. It was the preference of a majority of the Board (albeit a bare majority of the Board), and the Board clearly anticipated that the other two applications were to be denied.

Following the December 1 hearing, a number of events occurred that directly effected further scheduling of the three pending monopole applications. In the second week of January 2000, a new Planning Board Chairman was appointed to replace Mr. Yacyshyn. Also, a new Town Attorney was appointed, and a new Depu-

ty Town Attorney was appointed to represent the Planning Board. The new attorneys were immediately preoccupied with an unrelated report of attempted bribery of one member of the Planning Board by a real estate developer, which prompted the Town's Board of Trustees to impose a moratorium on the issuance of all special permits. This moratorium elicited correspondence from Plaintiffs' counsel and other attorneys with matters before the Planning Board, arguing that such a moratorium should not apply to special permits for wireless communication facilities. After reviewing the relevant case law, the Town Attorney agreed with Plaintiffs' counsel that the moratorium should not apply to special permits for wireless facilities, and he directed the Planning Board to schedule all the pending applications for wireless facilities for hearings and votes. The follow-up hearing for the proposed Congers sites was scheduled for March 29, 2000.

Meanwhile, both competing parties plowed ahead with their proposals. In January 2000, Goosetown closed on its purchase for its proposed site. And on March 8, 2000, SMSA filed an application for a building permit with the Building Inspector, Adolph Milch, and paid an application fee of $5,768.00.

The Planning Board asked Robert Geneslaw, a consultant to the Planning Board, to draft a final resolution for approving the SMSA site. However, on March 15, Geneslaw sent a memo to the Board indicating that additional information would be required concerning the SMSA proposed site (the one it proposed on December 1, not the one in its initial application), including information about the ground elevation at the site of the proposed tower, which Geneslaw indicated had been based on outdated U.S. Geological Survey maps. (Geneslaw Memo to Board, Mar. 15, 2000, attached to Snyder Decl. at Ex. 17.) He noted that both the Rockland County Planning Department and the Palisades Interstate Park Commission had reviewed

SMSA's revised proposal (pursuant to special permit application procedures) and had specific concerns about the site that the Board should take into consideration. The County specifically requested that the N.Y. State Department of Transportation conduct a review of the proposed facility. The Parks Commission was concerned that the proposed facility would be visible from its parks. In its review, the Parks Commission noted that both the Goosetown facility and the SMSA facility would be visible from the parks, but that SMSA would be at a higher, and therefore more visible, location. A copy of Geneslaw's memo made its way to SMSA's counsel.

SMSA also received a copy of a memo dated March 21, addressed to the Planning Board, from Town Consultant Morton Leifer. Leifer told the board that letters he received from numerous people subsequent to the December 1 meeting "make a strong case for revisiting some of the issues that had moved the Board to their present position." He noted that the Town had five sites from which to choose for placement of a wireless facility in the Congers area, but that the SMSA and Goosetown sites were the only two in contention. He further stated:

The view shed of both is nearly identical. Proximity to various occupied locations near the cell tower must therefor [sic] rank high as a deciding factor. *Given that the Planning Board cannot prohibit cellular siting based on health issues, it does have the option, and I believe the obligation, to maximize the distance of cell towers to all occupied locations whenever possible.*

(Leifer letter to Planning Board, Mar. 21, 2000 attached to Snyder Decl. at Ex. 19) (emphasis added).

Leifer's memo goes on to describe, in some detail, the problems with measuring and comparing the effects of radio frequency emissions in different locations (e.g., brick school buildings versus ballfields, etc.) He concluded that, because Goosetown's proposed site "has a greater overall aggregate

distance to all occupied locations and produces a higher percentage of improvement in reducing radio frequency exposure to those sites" it presented "the rational, reasonable and defensible choice." (*Id.*)

At the March 29 meeting, the Planning Board voted unanimously on a resolution to adopt the SEQRA negative declarations on the SMSA site. After lengthy discussion, the Board voted down a resolution to approve SMSA's application to build the facility on the Soffer site by a vote of 4–3. At the same meeting, the Board adopted negative declarations on the Goosetown site and voted 4–3 to approve the application of Goosetown. At the close of the meeting, Sprint withdrew its site application without prejudice.

On April 20, 2000, Plaintiffs e-mailed Goosetown to confirm that they: (1) were "definitely interested" in Goosetown's monopole; (2) had forwarded a proposed lease to Goosetown's attorney; (3) had left a message for Plaintiffs' counsel regarding the status of lease negotiations; and (4) were looking forward to working with Goosetown. (Breye–Gottlieb e-mail exchange, Apr. 20, 2000, attached to Gottlieb Aff. at Ex. G.).

The same day, they filed this action. Plaintiffs allege five causes of action arising out of the delay and ultimate denial of SMSA's application: (1) the denial was not based on substantial evidence as required by the TCA, 47U.S.C. § 332(c)(7)(B)(iii), and further violated Plaintiffs' right to due process under the New York and United States Constitutions; (2) the delay violated § 332(c)(7)(B)(ii) of the TCA; (3) the denial was impermissibly based on perceived health effects in violation of § 332(c)(7)(B)(iv); (4) the denial deprived Plaintiffs of their property rights under the Fifth and Fourteenth Amendments; and (5) Clarkstown's decision constituted a barrier to interstate delivery of telecommunications in violation of § 101(a) of the TCA. They demand a mandatory injunction enforcing what they contend is their property right to a building permit so that

they can construct their monopole. Nowhere in the complaint is there any suggestion that co-location on Goosetown's monopole will not completely close any gap in coverage that BAM currently experiences in Congers.

On April 26, 2000, in response to the suit (and after a conference before this Court), the Planning Board passed a resolution entitled "Resolution and Statement of Findings Regarding Special Permit Application by Crown Atlantic Company, LLC for Wireless Communication Monopole, SL 129–A–5.08, Congers." The resolution states in relevant part:

[T]he Town Telecommunications consultant [Leifer] advised the board that of the three proposed sites the "Goosetown site" was the overall superior site based on "prudent avoidance" and health, safety, and welfare factors, and

. . .

the Planning Board at its March 29, 2000 meeting failed to pass a resolution of approval for the Crown Atlantic site by virtue of a vote 3 in favor and 4 against.

. . .

be it resolved that the Planning Board hereby denies the application of Crown Atlantic Company . . . and issues the following statement of findings in support of its actions on the application:

1. With the Planning Board's approval of the Goosetown site at its March 29, 2000 meeting the needs of applicant, will be clearly met as required by Chapter 251 of the Code of the Town of Clarkstown and the Telecommunications Act by virtue of applicants agreement to co-locate on said "Goosetown site". It should be noted that the approval resolution for the Goosetown site requires that as a condition it demonstrates that it enter into agreement with other carriers within a limited time frame in order for its approval not to lapse. Additionally, Goosetown must offer agreement to all carriers at the market rate.

2. The Towns telecommunication consultant, after exhaustive and detailed review which is contained in the record, advised this board that the "Crown Atlantic Site," *would have a greater impact on the health, safety, and welfare of the residents of the immediate area.* He rendered this determination based on the Theory of prudent avoidance.

3. In the event that Goosetown does not build its facility, which was approved by the Planning Board at its March 29, 2000 meeting in accordance with that resolution, applicant may revive the subject application, with notice to the Planning Board secretary, without prejudice.

(Clarkstown Resolution, Apr. 26, 2000, attached to Kraushaar Decl. at Ex. A) (emphasis added).

The Goosetown Defendant Intervenors cross-moved to dismiss the complaint on May 5, 2000.

III. *Discussion*

A. *Plaintiffs' Motion for Entry of a Mandatory Injunction Lacks Merit and Is Denied*

1. *Plaintiffs Have Not Demonstrated Irreparable Injury*

Congress enacted the TCA in order to:

provide a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services *by opening all telecommunication markets to competition.* Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 492–93 (2d. Cir.1999) (citing H.R.Conf.Rep. No. 104–458 at (206) (1996), reprinted in U.S.C.C.A.N. 124).

In furtherance of the goal of promoting competition, Congress enacted the "National Telecommunications Siting Policy," 47 U.S.C. § 332(c)(7), which limits a local government's authority to deny the construction of wireless facilities, regulates how such decisions must be made, and provides for federal judicial oversight of decisions made by states and localities.[3]

■ Because the TCA provides for judicial oversight over how decisions concerning the siting of wireless facilities are made, zoning decisions about wireless facilities sites are reviewed more closely by courts than are other types of local zoning decisions to which federal courts traditionally apply great deference. *See Oyster Bay,* 166 F.3d at 493 (citations omitted). However, the purpose of the TCA is not to

---

**3.** The siting provisions state:

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) *shall not unreasonably discriminate among providers of functionally equivalent services;* and

(II) *shall not prohibit or have the effect of prohibiting the provision of wireless services.*

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions. 47 U.S.C. § 332(c)(7)(B). (emphasis added).

substitute the judgment of the federal courts (or the federal government) for that of state and local governments, but rather to ensure that localities do not exercise their power over zoning decisions in a way that results in the denial of telecommunication services or the denial of competition. *See Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 638 (2d Cir.1999). To paraphrase a long-standing maxim of antitrust law, it is telecommunications service, not telecommunications service providers, that the law protects. *See APT Pittsburgh Ltd. P'ship v. Penn Tp. Butler County of Penn.,* 196 F.3d 469, 480 (3d Cir.1999) (noting that the relevant "gap" in service is not the gap affecting providers, but rather users of wireless service).

■ A mandatory injunction is the proper remedy where a town violates the siting provisions of the TCA. *See Oyster Bay,* 166 F.3d at 497 (citations omitted). "The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies." *Ticor Title Ins. Co., et al. v. Cohen,* 173 F.3d 63, 68 (2d Cir.1999) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989)). And where a plaintiff seeks a mandatory injunction, courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985).

Plaintiffs contend that, as a result of the Town's denial of its application, they will be unable to close the gap in BAM's wireless services, which will result in irreparable loss to them, their wireless customers, and the public at large. This loss of service, they contend, justifies mandatory injunctive relief.

■ However, there is absolutely no evidence in the record before me that there will be any gap in coverage for BAM customers (who are the true beneficiaries of the TCA) if Goosetown builds its monopole and BAM co-locates on it. It is a condition of Goosetown's permit that it allow Plaintiffs, and anyone else who wishes to do so, to co-locate on its facility. And a senior official of BAM has twice indicated an interest in co-location—once before the Town Board decided where to award the permit, and once after. There is a complete absence of evidence that Plaintiffs, or any other wireless provider, will be denied wireless coverage if Goosetown builds the facility. The only thing that will be denied Plaintiffs is rent from other wireless carriers. But nothing in the TCA guarantees any particular competitor that it have access to anything other than the opportunity to provide service.

■ A local government is entitled to choose one wireless carrier or monopole builder over another, as long as the decision is not discriminatory.[4] The TCA was enacted to promote competition, and as long as the losing carrier is able to minimize the gap in its coverage through co-location or alternative sites, the TCA's prohibition against denying wireless services is not implicated. *See Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho–Ho–Kus,* 197 F.3d 64, 70 (3d Cir.1999) (holding that "local zoning policies and decisions have the effect of prohibiting wireless services if they result in 'significant gaps' in the availability of wireless services"); *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158 (S.D.Ca.2000) (holding that the denial of Airtouch's tower did not have the effect of denying services because Airtouch could have explored alternative sites); *Sprint Spectrum v. Bd. of Cty. Commissioners of Jefferson Cty.,* 59 F.Supp.2d 1101 (D.Colo.1999) (holding that denial of Sprint's application was not a

---

4. Plaintiffs bring no claim under the antidiscrimination provisions of the TCA, so there is no need to determine whether the decision was discriminatory.

prohibition of wireless services where Sprint had alternative sites, even if those sites were less desirable and more expensive). Because Plaintiff SMSA has not been denied wireless coverage, there is no loss of service. It therefore cannot demonstrate the irreparable harm necessary to entitle them to a mandatory injunction.

Plaintiffs contend that, by denying them their application, the Town Defendants have violated the TCA, and cite several cases supporting this contention. However, without exception, the cases cited by Plaintiffs involved situations in which a municipality denied any permit to build a facility that would remedy the wireless providers' gap in coverage.[5] That is not the fact pattern before me in this case.

In its zeal to call my attention to dozens of cases inapposite to the instant facts, Plaintiffs have failed to cite the most recent Second Circuit opinion that is actually on point. In *Sprint Spectrum v. Willoth,* 176 F.3d 630 (2d Cir.1999), Sprint sought a mandatory injunction compelling a municipality to permit it to erect three 150 foot cellular towers, which Sprint contended were necessary to insure adequate wireless coverage. The municipality denied Sprint's application after finding that adequate coverage could be obtained by erecting fewer than three towers. The Second Circuit upheld the district court's denial of the injunction, and noted that it did not "read the TCA to allow the goals of in-

creased competition and rapid deployment of new technology to trump all other considerations, including the preservation of the autonomy of states and municipalities." *Willoth,* 176 F.3d at 639. Consistent with the recognition of legitimate municipal considerations, the Circuit held:

> A local government may reject an application for construction of a wireless facility in an under-served area without thereby prohibiting wireless services if the service gap can be closed by less intrusive means.

*Id.* at 643 (citing *Town of Amherst v. Omnipoint Comm. Enter.,* 173 F.3d 9, 14 (1st Cir.1999)).

The Court continued:

> A local government can also reject an application that seeks permission to construct more towers than the minimum required to provide wireless telephone services in a given area. A denial of such a request is not a prohibition of personal wireless services as long as fewer towers would provide users in the given area with some ability to reach a cell site. *Id.*

By granting Plaintiffs the relief they seek, this Court would be compelling Clarkstown either to accept one competitor over another—for no discernable reason—or to permit the building of a second monopole in Congers. As the holding in *Willoth*

---

5. *See, e.g., Oyster Bay,* 166 F.3d at 497; *Nextel v. City of Mount Vernon,* 99 Civ. 10575 (S.D.N.Y. Nov. 5, 1999); *Sprint Spectrum L.P. v. Mills,* 1999 WL 688715 (S.D.N.Y. Aug.27, 1999); *Iowa Wireless Servs. v. City of Moline,* 29 F.Supp.2d 915, 924 (C.D.Ill.1998) (ordering defendant to grant plaintiff a special use permit "with all deliberate speed"); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove,* 20 F.Supp.2d 875, 881–82 (E.D.Pa. 1998) (ordering zoning board to issue requested special exception permit an declining to remand because to do so would "[f]rustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis"); *Illinois RSA No. 3, Inc. v. Cty. of Peoria,* 963 F.Supp. 732, 747 (C.D.Ill.1997) (concluding that injunction directing defendant to issue permit is appropriate relief under TCA); *BellSouth Mo-*

bility Inc. v. Gwinnett County, Georgia, 944 F.Supp. 923, 929 (N.D.Ga.1996) (granting plaintiffs' request for writ of mandamus and ordering defendant to grant plaintiffs' requested permit); *Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47 (D.Mass.1997); *Sprint Spectrum L.P. v. Jefferson County,* 968 F.Supp. 1457 (N.D.Ala.1997) (writ of mandamus ordering defendants to issue permit); *Alexander Cellular Corp. v. Town of Rochester,* Index No. 97–2602 (Sup.Ct. Ulster County 1997) (where it is clear that petitioner's application is complete and that the municipality has had ample opportunity to review same, the permit must be granted); *Sprint L.P. v. Zoning Board of Appeals of the Town of Guilderland,* Index No. 2871–97 (Sup.Ct. Albany County 1997) (zoning board directed to issue permit).

makes clear, nothing in the TCA compels such a result.

For all these reasons, I conclude that Plaintiffs' contention here that they will suffer irreparable harm as a result of Clarkstown's decision to approve Goosetown is disingenuous and wholly without merit.[6]

### 2. Plaintiffs Are Not Entitled to Relief under the TCA

For the reasons discussed below in connection with the Clarkstown Defendants' Motion for Summary Judgment, Plaintiffs have failed to make a showing that they are entitled to relief necessary to support an injunction—indeed, they have utterly failed to plead any viable cause of action under the TCA. For this reason, too, their claim for injunctive relief must be denied.

### B. The Clarkstown Defendants' Motion for Summary Judgment Dismissing The Complaint Is Meritorious and Is Granted

After reviewing the record, I am constrained to conclude that Plaintiffs have failed to raise an issue of material fact that they are entitled to any relief under the TCA or the New York or United States Constitutions. I therefore find that Defendants are entitled to summary judgment as a matter of law.

### 1. Denial in Writing

First, I dismiss as moot Plaintiffs' claim that the Clarkstown Planning Board's denial of SMSA's application at the March 29, 2000 meeting violated the TCA because it was not in writing. It is true that, as of April 20, when this action was filed, the Board had not made a determination in writing. However, the Resolution passed by the town on April 26, 2000 "closed that gap."

### 2. Denial Based on Substantial Evidence

■ Superficially more interesting, and apparently a matter of first impression, is Plaintiffs' contention that the Board's adoption of the "prudent avoidance" approach was not supported by substantial evidence in that it was made on the basis of perceived health effects, which is impermissible under the TCA.

As noted above, the TCA requires that denials be supported by substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(iii). "In determining whether the denial was supported by substantial evidence, courts must employ 'the traditional standard used for judicial review of agency actions.'" *Nextel Partners of Upstate New York v. Town of Canaan*, 62 F.Supp.2d 691, 694 (N.D.N.Y.1999). This is a deferential standard of review, and "courts may neither engage in their own fact-finding nor supplant the Town Board's reasonable determinations." *Id.* (citing *Oyster Bay*, 166 F.3d at 494.) Substantial evidence means something less than a preponderance but more than a scintilla: "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (internal quotations omitted).

The evidence on which the Board relies includes the testimony at the October, December and March Planning Board meetings, the submissions made by the Plaintiffs and Goosetown, and the written reports and oral opinions of the technical advisors. On the specific issue of "prudent avoidance," the Board relied primarily on the reports of Mr. Leifer. As Plaintiffs have placed no evidence in the record to contradict, refute or even call

---

6. While Plaintiffs make veiled allusions to a "political fix" in the Board's decision to approve the Goosetown site, as noted earlier, their complaint makes no direct challenge of that decision, nor does the record contain any

evidence that the approval of the Goosetown site was improper or in violation of the TCA or the Town Law. It is thus not necessary for this Court to review the standards under which the Town chose the Goosetown site.

into question the adequacy of Mr. Leifer's reports, or the accuracy of his conclusion that the Goosetown tower would result in a lower level of radio frequency emissions at key residences and schools in Congers, the Court finds that the Town based its decision on substantial evidence.

However, this does not answer the question of whether basing a choice between two competing sites on a desire to minimize the level of radio frequency emissions that would reach surrounding locations is a *per se* violation of the TCA.

The TCA prohibits a municipality from denying permission to build cellular facilities that meet the FCC's radio frequency emission standards on the basis of perceived environmental or health effects. *See* 47 U.S.C. § 332(c)(7)(b)(iv). In this instance, coverage was not denied solely on this impermissible basis. Rather, Clarkstown was confronted with three applications to build facilities to cover the same coverage gap.

■ Because co-location would solve everyone's coverage gap, Clarkstown had a perfect right to select just one company to build the facility. Under *Willoth*, the Town was not required to accept all three applications. In choosing between the two finalists, Goosetown and Plaintiffs, the Board admittedly relied on Leifer's theory of "prudent avoidance"—that is, his suggestion that, if all the applicants met the radio frequency requirements, the Board could consider how best to *minimize* the effects of radio frequency emission on the "health, safety and welfare" of the neighboring community. The novel question presented by this action is whether anything in the TCA prohibited the Board from adopting the theory of "prudent avoidance" in these circumstances.

This Court finds nothing in the statute that prohibits a municipality from seeking to minimize perceived health effects when deciding among competing applicants. In this case, all of the applicants met FCC emissions standards. The record reveals

that no one was denied consideration on health-related grounds; all three applications were considered on the merits. On the record before me, there appeared to be little or nothing to differentiate the two finalists (other than the relative visibility of the two monopoles, which was insubstantial) except their relative proximity to homes and schools.

As long as the goals of the TCA were met by granting some qualified applicant a permit to build a facility that would bridge the coverage gap, it seems to this Court that it should be a matter of indifference to the federal government who that someone is. And as long as no one who met the FCC's emissions standards was denied consideration, it seems to this Court that the municipality ought to be able to address the concerns of its citizens, and limit political fallout, by deciding to maximize the distance between the monopole and other municipal uses. Frankly, any other reading of the TCA in this case would virtually compel the municipality to award the permit to whatever applicant's site was closest to homes and schools, so as to avoid any implication that the decision was based on perceived health effects. That cannot be what Congress intended.

3. *Plaintiffs Had No Property Rights in the Permit*

■ Plaintiffs next contend that the Planning Board granted final approval for their monopole at the December 1, 1999 meeting, and that the Town's failure to issue the permit deprived them of their constitutional (property) rights. Plaintiffs are wrong. Under the New York Town Law, a special use permit cannot be granted without a written determination made pursuant to the State Environmental Quality Review Act ("SEQRA"). *See* N.Y. Town L. § 274 (McKinney 1999); *Devitt v. Heimbach*, 58 N.Y.2d 925, 460 N.Y.S.2d 512, 447 N.E.2d 59 (1983) (vacating a municipal enabling resolution on the grounds that the SEQRA determination had not been made); *Sun Beach Real Estate De-*

*velopment Corp. v. Anderson,* 98 A.D.2d 367, 469 N.Y.S.2d 964 (2nd Dept.1983) (a subdivision application is deemed complete upon receipt of the SEQRA determination), *aff'd* 62 N.Y.2d 969, 479 N.Y.S.2d 336, 468 N.E.2d 291. Nothing in the TCA trumps these state law procedural requirements. *See* 47 U.S.C. § 332(c)(7)(A). It is undisputed that the written resolution concerning the SEQRA determination for the SMSA site was not made until the March 29, 2000 meeting. No such resolution had been drafted, let alone voted on, in December. Thus, even if it was the intention of the Board to approve the SMSA site, as a matter of New York law, Plaintiffs could not have been given the right to a building permit at the December 1 meeting.

It is well established that the mere filing of an application for a permit, without the issuance of the permit itself, does not vest the applicant with any rights other than the right to appeal the failure to approve the application to the Zoning Board of Appeals. *See Yale Auto Parts v. Johnson,* 758 F.2d 54 (2d Cir.1985). The fact that Plaintiffs submitted a filing fee does not create a property interest; rather, Plaintiffs must prove that it was a certainty that they had a legitimate entitlement to the permit. *Id.* at 57 (citing *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The TCA does not create in wireless companies a "claim of entitlement" to permits to build cellular towers. To the contrary, as is clear from the Second Circuit's holding in *Willoth,* the approval process is fraught with uncertainty, particularly where three equally qualified companies are competing to build one monopole within 1500 feet of one another. *See also Natale v. Town of Ridgefield,* 170 F.3d 258 (2d Cir.1999) (holding that a builder did not have a federally protectable

property right to permits for a four lot single family home subdivision); *RRI Realty Corp. v. Southampton,* 870 F.2d 911 (2d Cir.1989) (applicant for building permit did not have sufficiently clear entitlement to permit for it to constitute a property interest.) Plaintiffs therefore fail to state a claim that they have been deprived of property rights under either the federal or New York Constitutions.

4. *Plaintiffs Have No Claim for "Unreasonable Delay" under the TCA*

■ Finally, Plaintiffs allege that the Clarkstown defendants violated the TCA by not acting on its application in a timely manner. Plaintiffs are correct that, under the TCA, the Town was required to act upon its request for placement of the monopole within a "reasonable time." *See* 47 U.S.C. 332(c)(7)(ii). My colleague, Judge Brieant, recently noted that the prohibition of TCA § 704 against unreasonable delay "implemented Congress' intent 'to stop local authorities from keeping wireless providers tied up in the hearing process' through invocation of state procedures, moratoria or gimmicks." *Lucas v. Planning Board of Town of LaGrange,* 7 F.Supp.2d 310, 321–22 (S.D.N.Y.1998) (quoting *Easton,* 982 F.Supp. at 50.) Congress did not, however, intend for particular wireless providers to be given preferential treatment, or to subject their requests for permits to any but the generally applicable time frames for zoning decisions. *See* H.R. 104–458, 104th Cong. 2nd Sess., Jan. 31, 1996, p. 208.

Under New York law, the applicable time frame for consideration of a special use permit is set forth in § 274–b(6) of the Town Law. *See* N.Y. Town L. § 274–b(6) (McKinney 1999).[7] Plaintiffs argue that,

7. That article of the Town Law provides in relevant part that the certain procedures be followed when determining whether a special use permit be issued:

The authorized board shall conduct a public hearing within sixty-two days from the day

an application is received on any matter referred to it under this section. . . .

*The authorized board shall decide upon the application within sixty-two days after the hearing. The time within which the authorized board must render its decision may be*

even if the Board did not approve the permit application at the December 1 meeting, it violated the TCA by failing to either approve or deny their application by February 2, 2000, or 62 days from the date of the public hearing.

Defendants respond that Plaintiffs cannot come to federal court and cry "unreasonable delay" under the TCA when, in fact, their application was the last of the three Congers proposals received by the Board, and the Board acted on their application as promptly—if not more promptly—than it did the Sprint and Goosetown applications. Further, Defendants note that there can be no claim under the "unreasonable delay" provisions of the TCA where the coverage requirements are met by another facility—which was approved on the very day that Plaintiffs' application was denied. Finally, Defendants contend that the 62-day time period for rendering a decision does not run until the municipality makes the SEQRA determination.

The record indicates that a public hearing was held on December 1, 1999, and at the close of that meeting, the Board voted to continue the matter. The next meeting held to discuss the matter was on March 29, 2000. This meeting was not a public hearing. Thus, under the Town Law, Clarkstown was under an obligation to reach a decision on the special use permit within 62 days, unless an extension was agreed to by mutual consent of the applicant and the Board.

There is plenty of evidence in the record that changes to the composition of the Planning Board, the appointment of the new attorneys and the dispute over the moratorium delayed the scheduling of the follow-up discussions of the Conger monopoles. There is, however, no evidence that either party consented to extend the statutory deadline.

I am therefore convinced by Plaintiffs' reasoning that failure to reach a decision within 62 days of the public hearing could be construed as an "unreasonable delay" under the TCA. As such, if Plaintiffs had been the only applicant with a permit application before the Board, and they had come before this Court on the 63rd day seeking injunctive relief, this Court would have looked favorably on such a request. That is because, where a plaintiff is the only applicant before a Board, and the Board fails to reach a decision within the statutorily proscribed period, the failure to reach a decision may have the *de facto* effect of prohibiting wireless services in violation of the TCA.

However, Plaintiffs' claim that the failure to reach the decision by the 63rd day entitles them to injunctive relief is without merit for two reasons. First, Plaintiffs did not bring this suit on the 63rd day. Instead, thinking that they were going to win final approval for the construction of their monopole, SMSA waited until after the Board had made its decision on March 29 to bring this lawsuit. The problem Plaintiffs now face is that, having waited until the Goosetown monopole was selected over their site, Plaintiffs can no longer make the claim that the delay had the effect of denial of wireless services. Indeed, the claim of delay is as moot as the claim of failure to make findings in writing.

The subsection of the TCA under which Plaintiff brings its claims for unreasonable delay applies siting criteria to those zoning decisions that prohibit or have the effect of prohibiting wireless services in a given area. *See* 47 U.S.C. § 332(c)(7)(B)(i)(II). The TCA provides that "[a]ny person adversely affected by any final action or failure to act by a state or local government ... may ... commence an action in any court of competent jurisdiction." *See* 47 U.S.C. § 332(c)(7)(B)(5). As a matter of

---

*extended by mutual consent of the applicant and the board.*
N.Y. Town L. § 274-b(6) (McKinney 1999) (emphasis added). The Clarkstown "Wireless

Law" mirrors the language in the N.Y. Town Law.

logic, a final action resulting in denial gives rise to a claim of improper denial. A failure to act resulting from delay gives rise to a claim of unreasonable delay and constructive denial. Congress could not have intended for plaintiffs to bring a claim that a Board's action was both a final denial of their application and a delay that had the effect of a denial. By waiting until after the final decision was rendered, Plaintiffs forwent a claim of "unreasonable delay." [8]

Second, even if Plaintiffs had moved for injunctive relief on the 63rd day they would not have been entitled to it. Under Plaintiffs' interpretation of the TCA and its effect on the Town Law, all three carriers with applications before the Board—Goosetown, Sprint and Plaintiffs—would have been entitled to a mandatory injunction on the 63rd day, because all three had been subjected to an "unreasonable delay." Plaintiffs' suggested result, if carried to its logical extreme, would have federal courts ordering towns to permit multiple wireless facilities every time a board failed to reach a decision by the 63rd day. Such a rule would be preposterous, and clearly against the holding in *Willoth*.

The New York State Legislature did not provide for the "default approval" of special use permits where a Board fails to reach a decision. Indeed, had it so intended, the legislature could have written it into the Town Law, as it did in the case of subdivision approvals. *See* N.Y. Town L. § 276(3) (a planning board which fails to act on a preliminary subdivision plat application within 45 days is deemed to have approved the preliminary plat). Thus, while mandatory injunction is the proper form of relief where the application is not

acted on and a gap in coverage ensues, it would inappropriate to order said relief in these circumstances where several applications remained pending before the Board.

Finally, Defendants argue that the 62–day time limit did not begin to run on December 1, because the public hearing was not "closed" until the SEQRA determination was made. And they argue by analogy that, because the approval process cannot come to a conclusion until the negative resolution passes, *see Honess 52 Corp. v. Widholt,* 176 Misc.2d 57, 672 N.Y.S.2d 237 (Sup.Ct. Duchess County 1998) (62–day review period under Section 276 governing approval of subdivisions does not begin to run until enactment of SEQRA findings), the public hearing must necessarily remain open until that act is accomplished. *See* 61 McKinney's Consl Laws of N.Y., § 274–b, Supp.Prac.Comm., T. Rice, p. 205 (noting that the time requirement for commencing a public hearing does not run until the SEQRA determinations have been made). And it is clear that SEQRA determinations are the *sine qua non* of special permit approval. Having found that Plaintiffs state no claim under the TCA, however, I need not reach this interesting question of New York law.

### 4. Goosetown's Ability to Meet SMSA's Coverage Requirements

Finally, Plaintiffs argue that Goosetown may not be capable of installing its facility in a timely manner, which would create an unreasonable delay in BAM's offering service in the gap area. However, there is not a shred of evidence in this record to support SMSA's bare-bones contention that Goosetown will not be able to build its monopole in a timely manner. The record

---

**8.** While Plaintiffs are correct that the application process went on longer than might be ideal, this appears to have resulted from a change in Town administration at the beginning of this year and a crisis generated by charges of impropriety against one Planning Board member, not from an effort to prohibit the provision of cellular services in Congers. Although I need not reach the question of

whether these facts might justify the six weeks delay, there is no evidence in the record that the Town was attempting to play "cat and mouse" with Plaintiffs in the hopes that Plaintiffs would drop their application. *See Town of Canaan,* 62 F.Supp.2d at 695 (finding delay was not unreasonable where Town deemed the environmental review incomplete).

reveals that Goosetown was the first applicant, having begun the process almost two years prior to Plaintiffs. It has already taken title to its site. Intervenor avers, without contradiction, that it is ready to go—and would have started construction but for this lawsuit. The Planning Board conditioned its approval of the Goosetown site on Goosetown installing its facility and making it available for co-location within six months of the date that its permit was approved.

Plaintiffs' speculation would appear to boil down to "we are big and they are small, and small can't guarantee getting the job done." But as Goosetown points out, one of the express goals of the TCA was to promote competition among cellular service providers. And, although Plaintiff seems to make an issue out of the fact that they are a federally licensed wireless provider whereas Goosetown in not federally licensed, the TCA does not provide for preferential treatment of licensed carriers. Thus, bigger is not necessarily better.

Summary judgment is entered for Defendants and all claims against them are dismissed.

This constitutes the decision and order of this Court.