**METROPCS NEW YORK, LLC, Plaintiff,**

v.

**The CITY OF MOUNT VERNON and the City of Mount Vernon Planning Board, Defendants.**

**No. 09 Civ. 8348 (SCR).**

United States District Court, S.D. New York.

July 22, 2010.

112. *See* 31 U.S.C. § 3730(d)(4).

Andrew P. Schriever, Anthony B. Gioffre, Christopher B. Fisher, Brian Patrick Galligan, Cuddy & Feder LLP, White Plains, NY, for Plaintiff.

Hina Sherwani, City of Mt. Vernon–Corporation Counsel, Mt. Vernon, NY, for Defendants.

## OPINION AND ORDER

STEPHEN C. ROBINSON, District Judge:

The Plaintiff in this case, MetroPCS, is suing the City of Mount Vernon for violations of the Telecommunications Act (TCA) of 1996, 47 U.S.C. § 332(c)(7)(B), New York State and local law by denying MetroPCS's wireless facility application and illegally assessing filing fees and consulting fees against MetroPCS. Specifically, MetroPCS claims that the City of Mount Vernon (1) denied MetroPCS's applications without substantial evidence; (2) attempted to illegally impose the City's preference for use of an alternative technology; (3) unreasonably discriminated against MetroPCS by refusing to approve a wireless facility that was indistinguishable from the other carriers' screened facilities providing functionally equivalent services at the site; and (4) arbitrarily assessed fees on MetroPCS that were not reasonably related to the review process. MetroPCS seeks summary judgment on these claims, and requests a permanent injunction requiring the City to immediately approve MetroPCS's application.

The City of Mount Vernon counters that MetroPCS's application was incomplete and full of contradictory data that showed that the gap in coverage was not primarily in Mount Vernon but in the neighboring municipality of Pelham. The City also argues that MetroPCS failed to consider the less obtrusive alternative of expanding

coverage using its already existing distributed antenna system (DAS).

From reviewing the record that was available to the City of Mount Vernon's Planning Board, the Court finds that the City's denial was not based on substantial evidence—until the City's opposition memo, there was no mention of why the site chosen by MetroPCS was too obtrusive, unsafe, or otherwise counter to the City's objectives in regulating wireless facility siting. The City improperly insisted that MetroPCS use the DAS system, delayed the application for an unreasonable period of time, and thus discriminated against MetroPCS in violation of the TCA. The Court grants an injunction requiring the City of Mount Vernon to approve MetroPCS's application and all concomitant permits to enable MetroPCS to erect the proposed stealth antenna. The Court finds that § 267–28(J)(17)(a) and § 267–28(J)(12) of the City's Zoning Code are illegal as they relate to fees to apply for the collocation of a wireless telecommunications facility, and the City unreasonably assessed fees under those provisions that it must now return to MetroPCS.

## I. FACTUAL BACKGROUND

The facts are taken from the Plaintiff's Rule 56.1 statements, since the Court finds that there are no material facts in dispute. MetroPCS is a telecommunications carrier licensed by the Federal Communications Commission (FCC) to construct and operate a network of wireless telecommunications facilities. On June 19, 2008, MetroPCS applied to the City of Mount Vernon Planning Board for a Special Use Permit that would allow MetroPCS to install a stealth six panel antenna on the rooftop of a building at 590 East 3rd Street in Mount Vernon, New York, pursuant to Section 267–28(J) of the Zoning Code of the City of Mount Vernon.

Declaration of Andrew Schriever ("Pit's Decl."), Ex. 3. The site is located on a building that had already been approved by the Planning Board to house the same type of wireless facilities for three other competing wireless carriers who provide functionally equivalent services: Nextel, T–Mobile, and AT & T. *See* Pit's Decl., Ex. 2 at Ex. L (Planning Board resolutions approving those applications).

MetroPCS chose the site in part because it qualified as the highest priority site in the community pursuant to the City's Zoning Code, Section 267–28(J)(5)(A)(*l* ). Pit's Decl., Ex. 3. MetroPCS also modeled its proposed stealth rooftop wireless facility on the facilities that had already been approved for the three other carriers. At the City's request, MetroPCS submitted its $6,000 zoning application fee and a $8,500 check to establish an escrow account for the payment of the fees incurred by the City's consultant, Center for Municipal Solutions (CMS). Pit's Decl., Ex. 7–8.

MetroPCS submitted its application on June 19, 2008. *See* Pit's Decl., Ex. 2. It included with its application various exhibits and reports as required by the City's Zoning Code, including a report by one of MetroPCS's radio frequency (RF) engineers who stated the MetroPCS's existing wireless network was not adequate to properly serve its customers who live in and travel through the City of Mount Vernon. Pit's Decl., Ex. 2 at Ex. C. As stated in the application cover letter, MetroPCS informed the Planning Board of the following:

- The height of the proposed antennas would not exceed the height of the existing rooftop structures;
- As based on the drawings and photosimulations, the proposed facility would be unobtrusive;
- There would be no environmental impact on the surrounding areas;

- The cumulative radio frequency emissions with the addition of MetroPCS's facility would not exceed any federal or state regulation limits;
- The facility would fill a critical gap in service that currently exists along the Hutchinson River Parkway, East 3rd Avenue, and Columbus Avenue.

In a letter dated July 15, 2008, Mr. Comi, the principal of CMS, told MetroPCS that the application was incomplete and the RF coverage plots did not demonstrate MetroPCS's need for the proposed site. *See* Pit's Decl., Ex. 9. Specifically, MetroPCS's RF coverage plots did not explain how its distributed antenna system (DAS) did not provide reliable coverage. Because the map did not contain any boundaries for the City, it was impossible to tell whether MetroPCS complied with Section 267–28(J)(4)(d)(*l*), which provides that proposed service must be "primarily and essentially within the City with service to adjacent municipalities to not exceed 40% of the total area to be covered by the proposed facility." It was also not clear whether DAS left a gap that the proposed site would fill, or whether the two systems would overlap significantly.

Other major deficiencies in the application included: failure to give an analysis of any alternative sites; failure to verify that the proposed facility complied full with New York State structural standards; failure to perform cumulative RF emissions calculations showing all service providers at the site; and failure to include key information on the RF propagation plot such as signal strength, City boundaries, or map scale. Mr. Comi attached CMS's propagation study form and requirements, and recommended that MetroPCS redo their propagation maps according to the form.

On September 23, 2008, MetroPCS submitted supplemental material to the Planning Board. Pit's Decl., Ex. 13. The new materials included a new RF propagation plot that showed the boundary between the City of Mount Vernon and Pelham municipality, the frequency of propagation (–84 dBm), and the proposed DAS coverage. MetroPCS specified that 60% of the service to be provided by the proposed facility will be within the City limits. MetroPCS also included a revised antenna site FCC RF compliance assessment, which conclusively showed that the cumulative RF emissions would not exceed federal or state regulations; a structural letter certifying that the installation complied with the strictest New York State regulations; and the submission to the New York State Office of Parks, Recreation and Historic Preservation.

Mr. Comi, writing on behalf of the Planning Board, responded on October 24, 2008 that MetroPCS had not addressed the material issues detailed in the initial review letter and requested more information. Pit's Decl., Ex. 14. He again requested the propagation data sheet enclosed with the first review letter. Mr. Comi also wanted a separate map of the DAS coverage and an explanation for why the proposed facility was necessary given the extensiveness of MetroPCS's currently constructed DAS. He noted that while MetroPCS claimed that 60% of the new service would fall within City limits, it was still not clear from the map provided and even more troubling was that the second set of maps showed a dramatic change in the proposed coverage without explanation.

MetroPCS's RF engineer, Gregory Sharpe replied to Comi's concerns via email on October 29, 2008. Pit's Decl., Ex. 15. First, he explained that CMS had the RF drivetest data for the DAS provided by ExteNet Systems (the company constructing the DAS for MetroPCS's use), and that

this information clearly identified the need for the rooftop facility proposed in the application. Second, Sharpe explained that the newest maps showed –84 dBm as the design criteria and so CMS's detailed propagation data form was unnecessary. Third, he clarified that DAS was not completely constructed at since power was not at each node. Lastly, Sharpe reiterated that the current plot showing –84 dBm design criteria clearly showed that over 60% of the coverage would be in Mount Vernon, and had been verified mathematically based on the per square mile coverage within the City's boundaries. Any changes between the first set of propagation plots and the current set were due to updating the frequency to meet the design criteria of the DAS. An attachment to the email showed the DAS nodes and the gap that the proposed facility would fill.

A follow up email from Sharpe dated on December 12, 2008 reflects that CMS continued to insist that MetroPCS had not provided enough information in a conference call with MetroPCS. Pit's Decl., Ex. 17. Sharpe reiterated that the coverage plots from the June 19, 2008 submission were initially propagated at –88 dBm whereas the September 23, 2008 submission reflected a –84 dBm level to be consistent with the DAS network, which explained the change in proposed coverage. He also provided the actual breakdown in coverage, showing that the total coverage was 0.2622 square miles, with 0.16829 square miles falling with Mount Vernon, equal to 64.1838%. And, 0.09391 square miles would fall within Pelham, equal to 35.8162%. Sharpe argued that MetroPCS was not proposing expansion of the ExteNet DAS network because it would not meet the coverage objective, defined as roads, homes, and businesses in Mount Vernon and parts of Pelham along the Hutchinson River Parkway. Pit's Decl., Ex. 17.

Because MetroPCS indicated that it would not submit anything further, CMS prepared its final report to the Planning Board recommending that the application be denied. Pit's Decl., Ex. 16. CMS's primary reason for its recommendation was that "the applicant has not explained why additional nodes cannot be added to the DAS network as an alternative, less intrusive means for deployment of service within the Mount Vernon coverage area, rather than the proposed rooftop facility." Pit's Decl., Ex. 18 at 2. The report also stated that "[t]he propagation studies provided show considerable overlap with the DAS coverage and [CMS] feel[s] that expanding the DAS network is a less obtrusive means to serve the coverage objectives, rather than the proposed facility within the City of Mount Vernon." *Id.* There was no other reason provided for denying the application.

In January 2009, MetroPCS attempted one last time to satisfy the requests for information from CMS. Pit's Decl., Ex. 19. It requested that CMS give a detailed list of what information remained outstanding. On January 12, 2009, Comi wrote a letter requesting information related to the possibility of using the DAS network to eliminate the coverage gap. MetroPCS responded on February 17, 2009 rejecting the legal or factual basis for Comi's demands and insisting that its application was procedurally complete. MetroPCS asserted that Mr. Comi was improperly trying to dictate the type of technology that MetroPCS used to provide service to the City. As in its other correspondence, MetroPCS reiterated its warning that the City's delay in scheduling a public hearing on the application was a violation of the TCA. However, MetroPCS did submit CMS's propagation data form, new maps

showing coverage at –84 dBm, –85 dBm, and –95 dBm, and the drivetest data for the DAS network that showed more clearly the coverage gap. Pit's Decl., Ex. 21.

Mr. Comi replied on March 2, 2009 that the application was still considered incomplete and there were remaining inconsistencies in the data showing the need for the proposed facility. For example, the maps showing –95 dBm coverage were virtually the same as the initial propagation maps submitted in June 2008 that purportedly were propagated at –88 dBm. Logically, –95 dBm frequency should show greater coverage than –88 dBm. CMS's implication was that MetroPCS used misleading propagation plots to meet the 60% coverage requirement and minimize the appearance of coverage falling outside of the City. Comi repeated again that the "obvious stated intent of the Mount Vernon Planning Board [is] that the preferred method of deployment for wireless telecommunications facilities within the City is via the existing DAS network." Pit's Decl., Ex. 22 at 2. Without information on the feasibility of expanding the DAS network, CMS would not consider MetroPCS's application complete.

Between March and May 2009, MetroPCS and Comi exchanged letters and engaged in conference calls to discuss the issue of whether a feasibility study of expanding the DAS network should be required as part of the application, or even if it was legal for the Planning Board to insist on an alternative technology given the decision in *New York SMSA Ltd. Partnership v. Town of Clarkstown*, 603 F.Supp.2d 715 (S.D.N.Y.2009); Pit's Decl., Ex. 23–26. In that case, the court held that legislation codifying a preference for alternate technologies over other FCC authorized technologies was preempted because federal law occupies the field when it comes to technical and operational aspects of wireless service. 603 F.Supp.2d 715, 725 (citation omitted).

Finally, on June 1, 2009, Comi submitted the final report regarding MetroPCS's application and asked that the matter be placed on the next Planning Board agenda. Pit's Decl., Ex. 27. Comi informed that Planning Board that MetroPCS "continues to refuse our requests for what we believe to be material information that is necessary to prove the need for this site." Pit's Decl., Ex. 27. Comi cited the same issue as the primary reason for recommending the Planning Board deny the application— the lack of information on the feasibility of using the DAS network as an alternative, less intrusive means for deployment of service within the City of Mount Vernon. *Id.* Additionally, Comi claimed that the proposed coverage maps showed that coverage outside the City would be greater than 40% and revised maps were not fully explained, leaving doubt over the accuracy of the information in MetroPCS's application.

The Mount Vernon Planning Board met on September 2, 2009 and decided to deny MetroPCS's application. The Final Resolution, which was filed on September 16, 2009, stated the following reasons for denying the application: there was "conflicting and missing application material" and "applicant refused to provide the requested information and states there will be no additional material forthcoming." Pit's Decl., Ex. 5 at 5. Specifically, the Resolution repeated Comi's concerns that MetroPCS had not provided proof of the need for the site by submitting data showing coverage could not be achieved by expanding the existing DAS network. *Id.* at 6. The Resolution also claimed that the applicant was asked to look at other buildings where there were fewer wireless facilities in existence as alternative site candidates but MetroPCS refused to provide this information. *Id.*

The City also requested an additional $5,000 to replenish the escrow account because the billing from Comi's firm through July 2009 totaled $16,842.70. It noted that MetroPCS would also be responsible for fees from July 2009 going forward which had not yet been invoiced.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The burden of demonstrating that no material fact exists lies with the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A court considering a motion for summary judgment must construe the evidence in the light most favorable to the non-moving party, drawing all inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003). Rather than asking if "the evidence unmistakably favors one side or the other," a court must ask whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If so, the court may not grant a defendant's motion for summary judgment. Assessing the credibility of witnesses and choosing between conflicting versions of events are roles for the fact finder, not for the court on summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996).

The non-moving party must present sufficient evidence such that a jury could reasonably find in its favor—"the mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "The non-moving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998).

## III. TELECOMMUNICATIONS ACT OF 1996

The Telecommunications Act (TCA) is an omnibus act to reform federal regulation of communication companies to promote greater competition amongst providers and improve consumer access to services. Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56 (Feb. 8, 1996) (codified 47 U.S.C. 151 et seq.); *see also Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 492–93 (2d Cir.1999). According to the Congressional Conference Committee, the TCA was intended "to provide for a pro-competitive, de-regulatory national policy framework to accelerate rapidly private sector deployment of advanced telecommunications and information technologies...." *See Town of Oyster Bay*, 166 F.3d at 492–93 (2d Cir.1999) (quoting H.R. Conf. Rep. No. 104–458, at 206 (1996), *reprinted in* 1996 U.S.C.C.A.N. 10, 124).

One way Congress wanted to encourage the rapid expansive of telecommunication services was to reduce the impediments imposed by local governments on the in-

stallation of facilities for wireless service. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). Therefore, Congress added § 332(c)(7) to impose some limits on state and local government authority to regulate the location, construction, and modification of such facilities. *Id.* To enforce these limitations, Congress created a right of action for "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent" with the limitations set out in § 332(c)(7)(B)(i)-(iv). 47 U.S.C. § 332(c)(7)(B)(v).

Under the TCA, state and local regulation "(I) shall not unreasonably discriminate among providers of functionally equivalent services, and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). In addition, "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and *supported by substantial evidence* contained in a written record." 47 U.S.C. 332(c)(7)(B)(iii) (emphasis added). In this, as in other contexts, "substantial evidence" is construed to mean less than a preponderance, but more than a scintilla of evidence. *See Town of Oyster Bay*, 166 F.3d at 494 (2d Cir.1999). In other words, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

The Second Circuit has recognized that the TCA "strikes a balance between 'two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" *Omnipoint Communications, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir.2005) (quoting *Town of Amherst, N.H. v. Omnipoint Communications, Inc.*, 173 F.3d 9, 13 (1st Cir.1999)). Therefore, while a "local government may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching 'facilities necessary to make and receive phone calls' .... a town may reject an application 'if the service gap can be closed by less intrusive means.'" *Nextel Partners, Inc. v. Town of Amherst*, 251 F.Supp.2d 1187, 1195–96 (W.D.N.Y.2003) (quoting *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir.1999)).

## IV. CITY OF MOUNT VERNON ZONING CODE

The City of Mount Vernon's Zoning Code regulates the siting of wireless service facilities in line with its stated purpose and legislative intent:

The City of Mount Vernon finds that wireless telecommunications facilities may pose significant concerns to the health, safety, public welfare, character and environment of the City and its inhabitants. The City also recognizes that facilitating the development of wireless service technology can be an economic development asset to the City and of significant benefit to the City and its residents. In order to insure that the placement, construction or modification of wireless telecommunications facilities is consistent with the City's land use policies, the City is adopting a single, comprehensive, wireless telecommunications facilities application and permit process. The intent of this zoning regulation is to minimize the negative impact of wireless telecommunications facilities, establish a fair and efficient process for review and approval of applications, assure an integrated, comprehensive review of environmental impacts of such facilities, and protect the health, safety

and welfare of the City of Mount Vernon as well as protect the scenic and aesthetic facets of the City. . . . Zoning Code § 267–28(J)(*l*). The City of Mount Vernon has designated the Mount Vernon Planning Board to handle applications for siting of wireless service facilities, and grants permission for the Planning Board to use consultants in the review process. Zoning Code § 267–28(J)(4)(a)(*l*); § 267–28(J)(12)(a).

All applications for the installation of a new wireless facility must include documentation that "demonstrates the need for the . . . facility to provide service primarily and essentially within the City with service to adjacent municipalities to not exceed 40% of the total area to be covered by the proposed facility." Zoning Code § 267–28(J)(4)(d)(*l*). The documentation shall include propagation studies and maps of the proposed site and all other planned, proposed, in service, or existing in the City and in contiguous municipalities. *Id.* If the applicant is addressing a capacity issue, the applicant must submit information on "usage and forecasted or present blockage; call volume, drive-test data results, including date of test." *Id.*

Other information is required as part of the application, such as descriptions of the proposed facility's location, size, height, proximity to landmarks and residential structures, technical specifications, frequency of transmission, and anticipated radio frequency emissions. The applicant must certify that the proposed facility will meet various federal, state, and local regulations, such as the FCC's limits on cumulative emissions, regulations related to structural safety, and environmental standards. Lastly, there must be a comprehensive visual impact assessment. Zoning Code § 267–28(J)(4)(d)–(j).

The Zoning Code also regulates the location of wireless facilities by setting location priorities. If a proposed site is not the highest priority available, the application must provide a detailed explanation as to why a site of higher priority was not selected. The highest priority location is "[o]n existing towers or other structures without increasing the height of the tower or structure." Zoning Code § 267–28(J)(5)(a)(*l*). The City anticipates that towers or wireless facility sitings should be able to accommodate at least five additional collocations since it requires applicants proposing to design a new tower to provide information on how the tower will accommodate "a least five additional antenna arrays equal to those of the applicant." Zoning Code § 267–28(J)(4)(t).

The City reserves the right to deny an application, even if it is proposing a site in an area of the highest priority, for any of the following reasons:

- Conflict with safety and safety-related codes and requirements;
- Conflict with the historic nature or character of a neighborhood;
- The use or construction of a wireless facility which is contrary to an already stated purpose of a specific zoning or land use designation;
- The placement poses an unacceptable risk to residents, the public, City employees, or employees of the service provider;
- Conflict with a provision of the City's wireless regulations;

Almost every provision of the City's Zoning Code reinforces the City's preference for collocating wireless facilities—the filing fee for applying for a permit to collocate on an existing site is only $6,000 rather than $12,000, collocation sites are given the highest priority, and the Code specifically states that "[l]ocation on existing towers or other structures without increasing the height shall be preferred by

the City, as opposed to the construction of a new tower." Zoning Code § 267–28(J)(17)(a); § 267–28(J)(6)(a). An applicant proposing a new tower faces a much higher burden to justify not using an existing tower. *Id.*

## V. DISCUSSION

MetroPCS has made a claim against the City of Mount Vernon and the Mount Vernon Planning Board for violations of the TCA by failing to base the denial of MetroPCS's application on substantial evidence and unreasonably discriminating against MetroPCS. 47 U.S.C. § 332(c)(7)(B)(i)(I), § 332(c)(7)(B)(iii).

### a. The Planning Board is not a suable entity under New York law

Pursuant to Fed. R. Civ. P. 17(b) an entity can only be sued in federal court if it would be suable under the laws of the state where it was created. *See Omnipoint Communications v. Town of LaGrange*, 658 F.Supp.2d 539, 552 (S.D.N.Y. 2009) (citation omitted). In this case, the Court applies New York law to determine who is a proper party in this action.

■ Plaintiff has sued both the City of Mount Vernon and the Planning Board. In New York, however, agencies of a municipality are not suable entities because they are "merely administrative arms of a municipality, [and] do not have a legal identity separate and apart from the municipality." *Hall v. City of White Plains*, 185 F.Supp.2d 293, 303 (S.D.N.Y.2002); *see also LaGrange*, 658 F.Supp.2d at 552 (collecting cases). Therefore, the City of Mount Vernon is the only proper defendant in the action. The Planning Board is dismissed from the action.

### b. The City of Mount Vernon failed to base its denial on substantial evidence

■ The TCA provides that a denial of a request to install wireless facilities must be "in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). To determine if a denial is supported by substantial evidence, the Court must employ the traditional standard for judicial review of agency actions. *Town of Amherst*, 251 F.Supp.2d at 1196–97 (citing *Nextel Partners of Upstate N.Y. v. Town of Canaan*, 62 F.Supp.2d 691, 695 (N.D.N.Y.1999)). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1197 (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

The record before the Court consists of all letters, emails, and submissions from June 19, 2008 when MetroPCS first filed its application to September 16, 2009 when the City of Mount Vernon filed its final resolution denying the application with the City Clerk's office.[1] The City of Mount Vernon claims that it based its denial of MetroPCS's application on MetroPCS's failure to demonstrate (1) the need for service; (2) the safety of its proposed installation; and (3) that the proposed action was more feasible than other options. *See* Defendant's Memorandum of Law in Opposition ("Defendant's Memo of Law"), at 7. The City also claims that MetroPCS submitted an incomplete application with conflicting information. Pit's Decl., Ex. 5.

The Court finds that the administrative record does not support Defendant's posi-

---

1. Other submissions made by the parties *de hors* the record were reviewed for context but not considered part of the written record on which the City was required to base its decision.

tion. First, the evidence supplied by MetroPCS demonstrates a need for service, and there is no other evidence in the record to controvert the existence of a coverage gap. Second, there is no mention in the record that the City believed MetroPCS's proposed installation was unsafe or that the City had real concerns about the safety of adding another antenna to the site. Third, the City never offered any reasons why the proposed site was obtrusive, not feasible, or otherwise disfavored by the City's zoning objectives. In fact, the City's insistence that MetroPCS provide information on the feasibility of extending the DAS network is in direct tension with the City's Zoning Code, which assigns the highest priority to plans such as MetroPCS's proposal to collocate an antenna on a current structure.

The administrative record shows that the City (via the recommendations of its consultants, CMS and Mr. Comi) denied MetroPCS's applications exclusively because MetroPCS refused to provide information about the viability of expanding the DAS network to fill its coverage gap. There were other concerns that the propagation plots provided by MetroPCS did not fully demonstrate the need for a wireless facility in Mount Vernon and that more than 40% of the proposed coverage would fall outside Mount Vernon's limits. However, MetroPCS eventually provided the information the City requested. The propagation maps finally showed (a) the coverage gap, (b) its relationship to the Mount Vernon boundary with Pelham, and (c) the signal frequency used to propagate the map. MetroPCS also provided its coverage per square mile analysis that demonstrated that more than 60% of the proposed coverage would fall within Mount Vernon. CMS and the Planning Board did not offer any evidence to contradict MetroPCS's submissions.

In Mr. Comi's first letter to MetroPCS, he requested confirmation that the proposed stealth antenna structure met New York's revised structural capacity regulation, ANSI–TIA–222–F. Pit's Decl., Ex. 9. MetroPCS addressed this issue in its next submission to CMS by providing a letter certification, which Mr. Comi deemed satisfactory. Pit's Decl., Ex. 13; Ex. 18 at 2. The only other safety-related concern Mr. Comi raised was the possibility that the antenna could be accessed by the public from the side and so he recommended as a condition of granting the permit that the entire rooftop by tested for RF emissions post-installation to verify compliance with federal and state RF emission regulations. Pit's Decl., Ex. 18 at 2. Mr. Comi's final report, submitted on June 1, 2009, mentioned no outstanding safety concerns. Pit's Decl., Ex. 27. The Planning Board's final resolution also did not raise any concerns about the safety of MetroPCS's proposed facility. Pit's Decl., Ex. 5.

The City's feasibility rationale is also not supported by any evidence. CMS and the City continued to insist that expanding the DAS network would be more feasible than siting another antenna at 590 East 3rd Street, where three other carriers already had antennas or received approval to install similar antennas, without providing any reason why the collocation was less feasible than DAS. MetroPCS submitted evidence that (1) its proposed antenna would not increase the height of the structure, (2) there would be no visual or environmental impact of collocating its antenna on the site, and (3) this was the highest priority site according to the City's Zoning Code. MetroPCS was not under an obligation to prove why DAS was less feasible because there was no evidence, much less an allegation, by the City that the collocation was not feasible or too obtrusive.

The Zoning Code clearly states that collocation on a site with other wireless facilities is the highest priority site in the City, and the only reasons the City may reject a proposal for such a high priority site are: conflict with safety and safety-related requirements; conflict with the historic nature or character of a neighborhood; conflict with zoning or land use designations; the imposition of an unacceptable risk to the public; or conflict with another provision of the City's wireless regulations. The City did not state that it had any of these concerns in the administrative record. The only motivation for requiring the DAS network analysis was that it "has been the obvious stated intent of the Mount Vernon Planning Board that the preferred method of deployment for wireless telecommunications facilities within the City is via the existing DAS network," according to Comi. Pit's Decl., Ex. 22 at 2. The Court finds that this "obvious stated intent" is belied by the Zoning Code's many provisions that favor collocation over new sites on public property such as utility poles.

Defendant argues that MetroPCS purposely submitted vague maps to hide the fact that it could not support its application, and that MetroPCS never provided the information the City requested. The Court notes that MetroPCS took many months to finally submit maps to the City that contained the information requested. However, in its February 17, 2009 submission, MetroPCS included maps that contained the municipal boundary, the CMS propagation data sheet, as well as maps showing the drive-test data of the DAS network to show the coverage gap that the proposed facility would fill. Pit's Deck, Ex. 21 at Ex. A–B. The City has not put forward any reason to question MetroPCS's RF engineer's analysis of the gap. The Court finds that the ambiguities of the first maps were satisfactorily resolved and MetroPCS demonstrated a need for service.

Defendant cites to *Omnipoint Holdings Inc. v. City of Cranston*, 586 F.3d 38, 49 (1st Cir.2009) for factors courts should assess in determining if a coverage gap is significant. However, *City of Cranston* deals with an entirely different TCA claim than is involved in this case. In *City of Cranston*, the carrier was claiming an effective prohibition of wireless service which requires courts to "find a 'significant gap' in coverage exists in an area," *see City of Cranston*, 586 F.3d at 48, whereas this case involves a claim that the City of Mount Vernon did not base its decision on substantial evidence and unreasonably discriminated against MetroPCS. Under Plaintiff's TCA claims, the wireless carrier does not need to show that the gap in coverage is significant, only that there is a need for service. *See, e.g. LaGrange*, 658 F.Supp.2d at 555–56.

Therefore, the Court must look at the administrative record and ask whether there is "such relevant evidence as a reasonable mind might accept as adequate to support" the conclusion that MetroPCS did not demonstrate a coverage gap. *LaGrange*, 658 F.Supp.2d at 554–55 (quotation omitted). As stated above, the City (including CMS, Mr. Comi, and the Planning Board) did not identify any evidence, let alone substantial evidence, to support the conclusion that there was no need for service. The Court grants summary judgment for the Plaintiff on its claim that the City of Mount Vernon violated the TCA by failing to base its decision on substantial evidence.

### c. Applicability of *Clarkstown* Decision

Plaintiff has cited the opinion in *New York SMSA Ltd. Partnership v. Town of Clarkstown*, 603 F.Supp.2d 715 (S.D.N.Y.

2009) to support its argument that the City of Mount Vernon's preference for DAS technology interferes with a field completely occupied by federal law and is preempted by the TCA. While the Court disagrees with Plaintiff that *Clarkstown* is directly on point, it finds its holding informs the decision in this case. In *Clarkstown,* the court struck down a town ordinance that *legislated* a preference for alternative technology, 603 F.Supp.2d at 726, whereas here the preference is stated by the Planning Board but not codified in the Zoning Code.

The distinction is significant because in *Clarkstown* the preemption analysis relied on the fact that the Town's legislated preference went beyond the individual permit decisions that are acceptable under *Willoth,* 176 F.3d 630 (2d Cir.1999), and *Omnipoint Comm. v. City of White Plains,* 430 F.3d 529 (2d Cir.2005), and interfered with the TCA's "pervasive scheme." *Clarkstown,* 603 F.Supp.2d at 726. Whereas in *Willoth* and *City of White Plains,* the Second Circuit allowed planning boards to examine aesthetic concerns with regard to applications setting forth "specific technologies to be used on specific sites," the Clarkstown Planning Board "legislated a preference for certain technology regardless of site location." *Id.*

In contrast, it is proper for a town to express a preference for an alternative technology for a specific application. For example, in *Nextel Comm. v. Town of Brookline,* 520 F.Supp.2d 238, 252–53 (D.Mass.2007), the court found the evidence presented was adequate to support the determination that DAS presented a feasible alternative to Nextel's proposal and that Nextel failed to fully investigate this option. Nextel proposed building a new installation on top of a private hospital, a use that was not allowed by the zoning code and was not eligible for a special use permit. *Id.* at 250–51. Evidence also showed that the site would not eliminate the coverage gap and Nextel's RF engineer conceded that additional installations would be necessary in the future. *Id.* at 247. While there were no other feasible sites for an antenna, the town's decision to deny the application did not have the effect of prohibiting wireless service because Nextel could use the DAS network. *Id.* at 252.

Unlike in *Town of Brookline,* MetroPCS's proposed site was feasible and even considered highly desirable by the City's own Zoning Code. As discussed above, the collocation of an antenna at the proposed site would fill MetroPCS's coverage gap without leaving any negative visual or environmental impact on the surrounding area. It is also noteworthy that MetroPCS's proposal is considered to be a higher priority than DAS would be under the City's Zoning Code. Therefore, the City of Mount Vernon's stated preference for DAS was not based on substantial evidence and was arbitrarily imposed on MetroPCS.

Defendant argues that because the DAS network was constructed for MetroPCS's use, MetroPCS should be required to use it. The Court disagrees. The purpose of the TCA was to encourage competition and facilitate the spread of new technologies. *See Clarkstown,* 603 F.Supp.2d at 725 (citing H.R. Conf. Rep. No. 104–458, at 113, 1996 U.S.C.C.A.N. at 124). The TCA created the Federal Communications Commission (FCC) to make rules and regulations for the use of personal communication services, including wireless services. *Id.* Because Congress has expressly delegated this authority to the FCC, its certification requirements for wireless technology preempt the field and leave no room for local and state authorities to impose separate, stricter require-

ments. *Id.* This rationale applies equally to this case, even though the City of Mount Vernon did not codify its preference.

The City of Mount Vernon essentially argued that because MetroPCS chose to construct a DAS network, it should have to fill in coverage gaps using that technology rather than installing an antenna. That rationale goes against the purpose of the TCA because it discourages wireless carriers from trying new technologies and optimizing the service they provide. As discussed below, the City's stance also leads to unreasonable discrimination. While *Clarkstown* is not directly on point, the Court still finds that it was improper for the City of Mount Vernon to insist on the use of alternative technology because there was no evidence that MetroPCS's application was otherwise deficient.

### d. The City of Mount Vernon unreasonably discriminated against MetroPCS

■ MetroPCS claims it has been subjected to unreasonable discrimination in violation of the TCA because its application was denied while the City approved applications for wireless facilities at the same site for three other competitive carriers. The record regarding the applications for the other carriers is sparse—MetroPCS only included the City's resolutions approving of Nextel and Cingular's applications—but one can see from the applications that MetroPCS applied to construct very similar wireless facilities on the same location. Pit's Decl., Ex. 2 at Exs. A, L. It is also clear that the City had already determined the construction of rooftop stealth antennas on 590 East 3rd Street had no negative environmental impact and otherwise complied with the City's Zoning Code. Pit's Decl., Ex. 2 at Ex. L.

Defendant does not contest that it discriminated against MetroPCS, but it argues that it was reasonable to treat Me-

troPCS differently than the other carriers with antennas at the site because MetroPCS is the only one with access to a DAS network. Defendant's Memo of Law, at 18. According to the legislative history of the TCA, reasonable discrimination was envisioned and expressly permitted because localities would retain the "flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." *Willoth,* 176 F.3d at 639 (citing H.R. Conf. No. 104–458, at 208, *reprinted in* 1996 U.S.C.C.A.N. at 222).

However, the Court finds that the City never raised any visual, aesthetic, or safety concerns about MetroPCS's application. Instead, the City wanted to require MetroPCS to use an alternative technology even though the preference went against the Zoning Code's explicit prioritization of collocated facilities. Without demonstrating that MetroPCS's proposed wireless facility had any other defect, the City of Mount Vernon unreasonably discriminated against MetroPCS. *See, e.g., Town of Amherst, N.Y.,* 251 F.Supp.2d at 1195 ("The record does not suggest ... that the addition of Nextel's antenna would have any significant impacts on the environment or the character of the community, and certainly none that would distinguish [its] application from that of VoiceStream.").

Defendant maintains that the other carriers substantiated their need for coverage using data that MetroPCS failed to provide and that it had concerns about the safety of putting yet another stealth antenna at the site. The Court has already rejected the first concern because the evidence in the record shows a coverage gap and there is no countervailing evidence to suggest that MetroPCS's propagation plot is inaccurate. The second concern must

also be rejected since it was not raised during the application process and appears to be a *post hoc* rationalization for denying the application. The Court concludes that the only reason the City treated MetroPCS's application as different from the other carriers was MetroPCS's access to the DAS network. Since this is not a valid basis for treating an applicant differently from similar competitor-carriers, the Court finds that the City of Mount Vernon unreasonably discriminated against MetroPCS in violation of the TCA.

### e. Defendant unreasonably delayed the application process

■ Plaintiff claims that Defendant violated TCA's mandate that "a request for permission to place or construct wireless telecommunications facilities must be acted on within a reasonable time" by delaying MetroPCS's application for nearly fifteen months. 47 U.S.C. § 332(c)(7)(B)(ii). The Court disagrees that the delay was entirely the City's fault. It took MetroPCS until February 17, 2009—eight months from its initial submission—to finally submit propagation maps that showed how the proposed coverage would fill in a gap created by the DAS network.

However, it took another seven months for the City to take a final action on the application, in part because of its improper insistence that MetroPCS explore the feasibility of the DAS network. CMS and Mr. Comi delayed the application by repeatedly requesting unnecessary information and belaboring issues already resolved, resulting in a failure to put the application on the Planning Board agenda for four months after MetroPCS made its final submission in February. *See, e.g.* Pit's Decl., Ex. 22, 26, 27 (finally recommending the application be placed on the agenda in June 2009). Courts have considered this sort of behavior by towns and local planning boards to constitute unrea-

sonable delay under the TCA. *See, e.g., Masterpage Comm., Inc. v. Town of Olive*, 418 F.Supp.2d 66, 78–80 (N.D.N.Y.2005); *Omnipoint Comm. v. Village of Tarrytown*, 302 F.Supp.2d 205, 225 (S.D.N.Y. 2004) ("The facts of this case . . . follow an all too familiar pattern. A wireless provider submits an application . . . only to be confronted with politically motivated, interminable, delays and ineffectual excuses . . . .").

Given that the Court has already found that it was improper to demand information about the feasibility of DAS, it follows that any delay due to those demands was also improper. The Court concludes that the City of Mount Vernon unreasonably delayed in addressing MetroPCS's application. The Court notes that injunctive relief is unavailable on this ground since the decision to deny MetroPCS's application has already been made; *see e.g. Masterpage Comm. Inc. v. Town of Olive*, 418 F.Supp.2d 66, 78; however, the finding of unreasonable delay is further evidence of the City's discrimination against MetroPCS as well as relevant to the reasonableness of the fees incurred throughout the application process.

### f. The City of Mount Vernon's assessment of fees was unreasonable

■ The City of Mount Vernon assessed fees against MetroPCS pursuant to Zoning Code § 267–28(J)(12), which provides that:

The Board and City may hire any consultant and/or expert necessary to assist [them] in reviewing and evaluating the application. . . . The applicant shall deposit with the City funds sufficient to reimburse the City for all reasonable costs of consultant and expert evaluation and consultation to the City in connection with the review of any application . . . . [and] [t]he initial deposit shall be $8,500.

Zoning Code § 267–28(J)(12)(a)–(b). There is no limitation on the amount of funds needed; in fact, the Zoning Code specifically leaves it open-ended in its provisions: "The total amount of the funds needed as set forth in Subsection J(12)(b) of this section may vary with the scope and complexity of the project, the completeness of the application and other information as may be needed to complete the necessary review, analysis and inspection...." Zoning Code § 267–28(J)(12)(c). Furthermore, in contrast to the charge of $500 for special use permit applications, the City charges $6,000 to $12,000 for permit applications for wireless telecommunications facilities. *Compare* Zoning Code § 267–25 *with* Zoning Code § 267–28. The City of Mount Vernon has the authority to charge fees pursuant to N.Y. Mun. Home Rule § 10(1)(ii)(a)(9–a).

The case cited by both parties, *Jewish Reconstructionist Synagogue of North Shore, Inc. v. Incorporated Village of Roslyn Harbor*, 40 N.Y.2d 158, 162–63, 386 N.Y.S.2d 198, 352 N.E.2d 115 (1976), addresses a village ordinance establishing fees where the New York State legislature has not provided how the village should pay its expenses. In that scenario, the New York Court of Appeals held that "the Legislature's mandate carries with it an implied limited delegation of power to the local government to enact ordinances necessary to carry out the legislative plan." *Id.* at 163, 386 N.Y.S.2d 198, 352 N.E.2d 115.

 It is well settled in New York that "where a license or permit fee is imposed under the power to regulate, the amount charged cannot be greater than a sum reasonably necessary to cover the costs of issuance, inspection and enforcement" and "[t]o the extent that fees charged are exacted for revenue purposes or to offset the cost of general governmental functions they are invalid as an unauthorized tax." *Torsoe Bros. Const. Corp. v. Bd. of Trustees of Inc. Village of Monroe*, 49 A.D.2d 461, 464–65, 375 N.Y.S.2d 612 (N.Y.A.D. 1975).

 Thus, even though the City of Mount Vernon has an explicit grant of authority under N.Y. Mun. Home Rule § 10(1)(ii)(a)(9–a), the Court still agrees that "fees charged ... [should] be reasonably necessary to the accomplishment of the statutory command," and the fees "should be assessed or estimated on the basis of reliable factual studies or statistics." *Jewish Reconstructionist Synagogue*, 40 N.Y.2d at 163, 386 N.Y.S.2d 198, 352 N.E.2d 115; *see also New York Telephone Co. v. City of Amsterdam*, 200 A.D.2d 315, 317, 613 N.Y.S.2d 993 (N.Y.A.D.1994). Without some limitation, there is a risk that the local government will incur "not only necessary costs but also any which it, in its untrammeled discretion, might think desirable or convenient." *Jewish Reconstructionist Synagogue*, 40 N.Y.2d at 163, 386 N.Y.S.2d 198, 352 N.E.2d 115.

Defendant has not presented any evidence explaining why it is more labor-intensive or time-intensive to review a special permit for a wireless telecommunications facility than another major construction project subject to the $500 special use permit application fee such that the fee for a telecommunications facility should be twelve to twenty-four times higher. This is particularly true when MetroPCS submitted an application that was almost identical to three others already approved by the City and presumably would not have required that much more additional work on the City's part. The Court is also concerned that there is no limitation on the amount of consulting fees the applicant could be required to pay. The City of Mount Vernon has unlimited discretion to

426

charge a wireless carrier prohibitive fees by simply dragging out the process and utilizing consultants for its convenience—rather than out of necessity. Furthermore, the Court has already determined that the City discriminated against MetroPCS by demanding information on the feasibility of using DAS and this led to an unacceptable delay. Therefore, the assessment of fees for work done by CMS and Mr. Comi related to the City's continued insistence on using DAS was overstated as well.

■ Defendant argues that the fees have been charged without challenge in over thirty wireless facility special permit applications. It may be the case that a carrier whose application has been approved is disinclined to challenge the City's assessment of fees, but in any case the Court is more troubled by the absence of any guiding standard or limitation on how much the applicant can be charged rather than the actual amount charged in prior application processes. Therefore, the Court strikes down § 267–28(J)(12) of the City of Mount Vernon's Zoning Code for wireless facility special permit applications as exceeding the City's authority to assess fees. *See, e.g., Jewish Reconstructionist Synagogue,* 40 N.Y.2d at 165–66, 386 N.Y.S.2d 198, 352 N.E.2d 115. MetroPCS is entitled to a disgorgement of the consulting fees assessed in connection with its application.

The Court also finds that § 267–28(J)(17) is invalid. MetroPCS claims that there is no justification for charging $6,000 to $12,000 for a special permit application for a wireless telecommunications facility, in contrast to just $500 for all other special use permits which cover such major projects as universities, drive-thru fast food restaurants, domiciliary-care facilities, private schools, radio towers for amateur radio stations, bars, nightclubs, car dealer-

ships and repair stations, churches, daycare centers, satellite earth stations, asphalt heating/mixing plants, manufacturing facilities, and adult entertainment facilities. *See* Zoning Code § 267–25, Ex. 3, Fee Schedule for Applications for Permits at 7.

While the City of Mount Vernon asserts that it is more expensive to review applications for telecommunications facilities, it does not adequately justify the large fee associated these applications, *see ATM One LLC v. Inc. Village of Freeport,* 276 A.D.2d 573, 574, 714 N.Y.S.2d 721 (N.Y.2d Dept.2000)—presumably the employment of interns to keep up with the extra paperwork, administering accounts, handling the follow-up communications between the applicants and the Board, consultants, building inspectors and technical analysts costs no more for a wireless telecommunications facility than any other special use permit application. *See* Defendant's Opposition Memorandum, at 25. Defendants obliquely make the argument that because the TCA requires that applications for wireless telecommunications facilities be handled without unreasonable delay, this justifies the higher cost. Ironically, the extraordinary costs incurred in this case were largely due to unreasonable delays as the City discriminated against MetroPCS and denied its application without substantial evidence.

However, the Court recognizes that some legitimate work was performed on MetroPCS's application and it would be unjust to grant the application while requiring the disgorgement of all the fees assessed throughout the application process. The Court has requested that the parties present to the Court what they believe to be a reasonable and appropriate amount that MetroPCS should be required to pay in light of the Court's decision in this case. In sum, the Court strikes §§ 267–28(J)(12) and 267–28(J)(17) of the

City of Mount Vernon's zoning code on the basis that there is no codified limit to the consulting fees that can be assessed over the course of the application process and the City has not presented any explanation for the relatively high application fee. The Court will issue a summary Order imposing on MetroPCS an appropriate fee as determined by the Court and the parties and requiring the City to disgorge any additional fees it has already assessed.

## VI. CONCLUSION

The Planning Board is dismissed from the action since it is not a suable entity. The Court grants summary judgment in favor of Plaintiff and grants Plaintiff's injunction requiring the City of Mount Vernon to immediately approve MetroPCS's application and grant any associated permits to enable it to install its proposed antenna. The Court finds that the City of Mount Vernon violated the TCA by failing to base its denial of MetroPCS's application on substantial evidence, discriminating against MetroPCS, and unreasonably delaying its decision. The Court also strikes down the City's fee provisions § 267–28(J)(12) and § 267–28(J)(17)(a) as invalid, and will specify the amount that MetroPCS is required to pay to the City in a subsequent Order. The Clerk of the Court is directed to term docket entry 13.

*It is So Ordered.*